## CHRISTIAN ACTIVITIES COUNCIL, CONGREGATIONAL *v.* TOWN COUNCIL OF THE TOWN OF GLASTONBURY ET AL.
### (SC 15669)

Callahan, C. J., and Borden, Berdon, Norcott, Katz, Palmer and McDonald, Js.[1]

[1] This appeal originally was argued before a five member panel of this court consisting of Chief Justice Callahan and Justices Borden, Berdon, Norcott and Katz. Subsequently, the court decided to consider the case en banc, and Justices Palmer and McDonald were added to the panel.

Argued October 30, 1997—officially released July 20, 1999

*David F. Sherwood*, with whom was *Wesley W. Horton*, for the appellant (plaintiff).

*William S. Rogers*, with whom was *Kevin S. Murphy*, for the appellee (named defendant).

*Timothy D. Bates*, for the appellee (defendant Land Heritage Coalition of Glastonbury, Inc.).

*Terry J. Tondro, Philip D. Tegeler* and *John Brittain* filed a brief for the Connecticut Civil Liberties Union Foundation et al. as amici curiae.

*Opinion*

BORDEN, J. The principal issue in this appeal involves the scope of judicial review in an affordable housing land use appeal pursuant to General Statutes § 8-30g.[2] The plaintiff, Christian Activities Council, Con-

---

[2] General Statutes § 8-30g provides: "(a) As used in this section: (1) 'Affordable housing development' means a proposed housing development (A) which is assisted housing or (B) in which not less than twenty-five per cent of the dwelling units will be conveyed by deeds containing covenants or restrictions which shall require that such dwelling units be sold or rented at, or below, prices which will preserve the units as affordable housing, as defined in section 8-39a, for persons and families whose income is less than or equal to eighty per cent of the area median income or eighty per cent

of the state median income, whichever is less, for at least thirty years after the initial occupation of the proposed development; (2) 'affordable housing application' means any application made to a commission in connection with an affordable housing development by a person who proposes to develop such affordable housing; (3) 'assisted housing' means housing which is receiving, or will receive, financial assistance under any governmental program for the construction or substantial rehabilitation of low and moderate income housing, and any housing occupied by persons receiving rental assistance under chapter 319uu or Section 1437f of Title 42 of the United States Code; (4) 'commission' means a zoning commission, planning commission, planning and zoning commission, zoning board of appeals or municipal agency exercising zoning or planning authority; and (5) 'municipality' means any town, city or borough, whether consolidated or unconsolidated.

"(b) Any person whose affordable housing application is denied or is approved with restrictions which have a substantial adverse impact on the viability of the affordable housing development or the degree of affordability of the affordable dwelling units, specified in subparagraph (B) of subdivision (1) of subsection (a) of this section, contained in the affordable housing development, may appeal such decision pursuant to the procedures of this section. Such appeal shall be filed within the time period for filing appeals as set forth in sections 8-8, 8-9, 8-28, 8-30, or 8-30a, as applicable, and shall be made returnable to the superior court for the judicial district where the real property which is the subject of the application is located. Affordable housing appeals shall be heard by a judge assigned by the Chief Court Administrator to hear such appeals. To the extent practicable, efforts shall be made to assign such cases to a small number of judges so that a consistent body of expertise can be developed. Appeals taken pursuant to this subsection shall be privileged cases to be heard by the court as soon after the return day as is practicable. Except as otherwise provided in this section, appeals involving an affordable housing application shall proceed in conformance with the provisions of said sections 8-8, 8-9, 8-28, 8-30, or 8-30a, as applicable.

"(c) Upon an appeal taken under subsection (b) of this section, the burden shall be on the commission to prove, based upon the evidence in the record compiled before such commission that (1) (A) the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record; (B) the decision is necessary to protect substantial public interests in health, safety, or other matters which the commission may legally consider; (C) such public interests clearly outweigh the need for affordable housing; and (D) such public interests cannot be protected by reasonable changes to the affordable housing development or (2) (A) the application which was the subject of the decision from which such appeal was taken would locate affordable housing in an area which is zoned for industrial use and which does not permit residential uses and (B) the development is not assisted housing, as defined in subsection (a) of this section. If the commission does not satisfy its burden of proof under

this subsection, the court shall wholly or partly revise, modify, remand or reverse the decision from which the appeal was taken in a manner consistent with the evidence in the record before it.

"(d) Following a decision by a commission to reject an affordable housing application or to approve an application with restrictions which have a substantial adverse impact on the viability of the affordable housing development or the degree of affordability of the affordable dwelling units, the applicant may, within the period for filing an appeal of such decision, submit to the commission a proposed modification of its proposal responding to some or all of the objections or restrictions articulated by the commission, which shall be treated as an amendment to the original proposal. The filing of such a proposed modification shall stay the period for filing an appeal from the decision of the commission on the original application. The commission may hold a public hearing and shall render a decision on the proposed modification within forty-five days of the receipt of such proposed modification. The commission shall issue notice of its decision as provided by law. Failure of the commission to render a decision within said forty-five days shall constitute a rejection of the proposed modification. Within the time period for filing an appeal on the proposed modification as set forth in sections 8-8, 8-9, 8-28, 8-30, or 8-30a, as applicable, the applicant may appeal the commission's decision on the original application and the proposed modification in the manner set forth in this section. Nothing in this subsection shall be construed to limit the right of an applicant to appeal the original decision of the commission in the manner set forth in this section without submitting a proposed modification or to limit the issues which may be raised in any appeal under this section.

"(e) Nothing in this section shall be deemed to preclude any right of appeal under the provisions of sections 8-8, 8-9, 8-28, 8-30, or 8-30a.

"(f) Notwithstanding the provisions of subsections (a) to (e), inclusive, of this section, the affordable housing appeals procedure established under this section shall not be available if the real property which is the subject of the application is located in a municipality in which at least ten per cent of all dwelling units in the municipality are (1) assisted housing or (2) currently financed by Connecticut Housing Finance Authority mortgages or (3) subject to deeds containing covenants or restrictions which require that such dwelling units be sold or rented at, or below, prices which will preserve the units as affordable housing, as defined in section 8-39a, for persons and families whose income is less than or equal to eighty per cent of the area median income. The Commissioner of Economic and Community Development shall, pursuant to regulations adopted under the provisions of chapter 54, promulgate a list of municipalities which satisfy the criteria contained in this subsection and shall update such list not less than annually.

"(g) Notwithstanding the provisions of subsections (a) to (e), inclusive, of this section, the affordable housing appeals procedure shall not be applicable to an affordable housing application filed with a commission during the one-year period after a certification of affordable housing project completion

gregational, appeals[3] from the judgment of the trial court. By that judgment, the trial court dismissed the plaintiff's appeal from the action of the named defendant, the town council of the town of Glastonbury (defendant),[4] which had denied the plaintiff's application for a change of zone for the purpose of developing a parcel of land in Glastonbury as an affordable housing development. The plaintiff claims that: (1) the trial court applied an improper scope of review under § 8-30g (c)

issued by the Commissioner of Economic and Community Development is published in the Connecticut Law Journal. The Commissioner of Economic and Community Development shall issue a certification of affordable housing project completion for the purposes of this subsection upon finding that (1) the municipality has completed an initial eligible housing development or developments pursuant to section 8-336f or sections 8-386 and 8-387 which create affordable dwelling units equal to at least one per cent of all dwelling units in the municipality and (2) the municipality is actively involved in the Connecticut housing partnership program or the regional fair housing compact pilot program under said sections. The affordable housing appeals procedure shall be applicable to affordable housing applications filed with a commission after such one-year period, except as otherwise provided in subsection (f) of this section."

Although the legislature has amended § 8-30g several times since 1994, the date that the defendant denied the plaintiff's application for the zone change, the amendments are not relevant to this appeal. Hereafter, unless otherwise indicated, all references to § 8-30g are to the current revision of that statute.

[3] The plaintiff appealed from the judgment of the trial court to the Appellate Court, following certification to appeal by that court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

[4] The other defendant in this appeal is Land Heritage Coalition of Glastonbury (Land Heritage), which had intervened in the zoning proceedings at issue pursuant to General Statutes § 22a-19. Under § 22a-19 (a), a legal entity may intervene in an "administrative . . . or other proceeding" by asserting in a verified petition that the proceeding "involves conduct which has, or which is reasonably likely to have, the effect of unreasonably polluting, impairing or destroying the public trust in the air, water or other natural resources of the state." Although there were several individual defendants who also had intervened pursuant to § 22a-19, they are no longer parties to this appeal. Hereafter, we refer to the Glastonbury town council as the defendant because the zoning action of that body is the basis of the plaintiff's appeal, and the arguments of Land Heritage largely parallel those of the town council.

(1) (B), (C) and (D); (2) the trial court improperly failed to consider whether all four of the criteria established by § 8-30g (c) (1) had been met; (3) the trial court improperly failed to consider all of the defendant's reasons for denying the plaintiff's application; and (4) the defendant did not meet its burdens of proof under § 8-30g (c) (1). We affirm the judgment of the trial court.

Certain facts and the procedural history are undisputed. The parcel of land in question consists of 33.42 acres located on the northerly side of Hebron Avenue and the westerly side of Keeney Street in Glastonbury. The land currently is owned by the Metropolitan District Commission (Metropolitan), a public water company, from whom the plaintiff has contracted to purchase it conditioned upon, among other things, the ability of the plaintiff to secure zoning approval from the town for construction of at least twenty-six single family affordable dwellings on the parcel. Metropolitan also owns a tract of approximately 546 acres located directly across Keeney Street, and stretching to the north, from the parcel in question. The parcel at issue in this case, along with the rest of Metropolitan's property, is currently zoned "reserved land" on the Glastonbury zoning map, a classification that places lands owned by, inter alia, public service water companies "in a special zone to ensure the proper, orderly and planned growth of such land in accordance with surrounding development and the Glastonbury Plan of Development." Glastonbury Zoning Regs., § 4.10.1. No residential development is permitted in a "reserved land" zone. That classification permits residential development at a density of one unit per acre. On the town's plan of development, however, the parcel is designated as "fringe suburban." That designation identifies land as suitable for residential development at a density of one dwelling unit per acre. The parcel sought to be developed is bordered on the east by Keeney Street, and on the south, west

and north by other parcels that are zoned as "rural residence."

Under the Glastonbury charter, the defendant has the power to rezone property. Accordingly, pursuant to § 8-30g, the plaintiff filed an affordable housing development application with the defendant to rezone the parcel from "reserved land" to "rural residence." The proposed development was to be comprised of detached affordable housing to be offered to low and moderate income minority families. In connection with the application, the plaintiff submitted a preliminary subdivision plan for an open space subdivision of twenty-eight units, along with house plans illustrative of the type of housing to be constructed. The subdivision plan showed the parcel to be divided into twenty-eight lots averaging one-half acre in size, bisected by approximately thirteen acres of open space encompassing a six acre inland wetlands area. This preliminary subdivision plan contained two access roads to be constructed: one leading from Hebron Avenue, serving the eleven lots south of the open space; and the other leading from Keeney Street, serving fourteen of the lots north of the open space. The three remaining lots, north of the open space, would have direct access to Keeney Street.

The defendant referred the plaintiff's application to the Glastonbury plan and zoning commission (plan and zoning commission) for a recommendation, as required by the zoning regulations. After a public hearing, the plan and zoning commission recommended that the application be granted. In doing so, however, the plan and zoning commission made certain comments regarding the parcel. The Glastonbury conservation commission (conservation commission) also considered the plaintiff's application and, although not formally making a recommendation on the proposal, submitted to the plan and zoning commission a resolution expressing

a number of "concern[s]" regarding the proposal "for inclusion into the [plan and zoning commission] public hearing record on this matter." We discuss later in this opinion the relevant comments of the plan and zoning commission and the relevant expressed concerns of the conservation commission.

The defendant, after a public hearing in June, July and August, 1994, denied the plaintiff's application. In doing so, the defendant gave the following reasons that are pertinent to this appeal: "1. The proposed development would create a new road exiting onto an already acknowledged dangerous curve on Hebron Avenue just west of its intersection with Keeney Street in an area of high risk, serious traffic accidents and high volume. The proposed development would increase existing traffic hazards and would expose residents of the proposed development and others who travel in that intersection to unreasonable risks. 2. It is in the best interest of the Town to provide open space in order to meet local and regional needs. Further, the 1994 Plan of Development recommends that [Metropolitan] lands in the Keeney Street area be considered for Town purchase and preservation as open space. . . .[5] 4. The proposed development could endanger a potential future water supply source as identified by Environmental Planning Services Report dated April 17, 1991 prepared for [Metropolitan] at Page 9. 5. These considerations outweigh the need for affordable housing at this site, especially because of the availability of other parcels in town suitable for affordable housing."[6]

---

[5] As its third reason, the defendant stated: "3. [Metropolitan] holds the subject property in public trust and development should only be considered upon the completion of a comprehensive plan for all [Metropolitan] holdings in the Keeney Street area." Although the defendant offered this reason in the trial court, it does not do so in this court. We therefore disregard it.

[6] The defendant also offered a sixth reason as follows: "6. In addition to the specifically stated reasons the members voting in favor of this motion to deny the application also incorporate their individual stated reasons as already set out in the record." The trial court ruled that the reasons given by the individual members were not entitled to consideration, and the defendant

The plaintiff appealed to the trial court pursuant to § 8-30g (c). The trial court, relying on our statement that, in an affordable housing land use appeal, as in a traditional zoning appeal, "[t]he zone change must be sustained if even one of the stated reasons is sufficient to support it"; (internal quotation marks omitted) *West Hartford Interfaith Coalition, Inc.* v. *Town Council,* 228 Conn. 498, 513, 636 A.2d 1342 (1994); concluded that there was sufficient evidence in the record to support the defendant's fourth stated reason, namely, that the proposed development may destroy a potential future source of public water. Accordingly, the trial court discussed the evidence in the record only with regard to that stated reason, and did not discuss the evidence underlying any of the other stated reasons. The court also determined that the defendant's decision otherwise complied with § 8-30g (c). It, therefore, dismissed the plaintiff's appeal. This appeal followed.

## I

## A

We begin by outlining the differences that we have identified thus far between an affordable housing land use appeal pursuant to § 8-30g, and a traditional zoning appeal.[7] First, an appeal under § 8-30g (b) may be filed only by an applicant for an affordable housing development whose application was "denied or [was] approved with restrictions which have a substantial adverse impact on the viability of the affordable housing development or the degree of affordability of the affordable dwelling units . . . ." Thus, where the town has granted such an application, either outright or without

does not defend them in this appeal. Accordingly, we do not consider the sixth reason for the defendant's decision.

[7] We emphasize that these are the differences between the two forms of zoning appeals that we have identified thus far. Future cases may disclose other differences. We leave those determinations, however, to those cases in which the record makes it appropriate to address them.

imposing such restrictions, there is no appeal under § 8-30g (b).[8]

Second, the scope of judicial review under § 8-30g (c) requires the town, not the applicant, to marshal the evidence supporting its decision and to persuade the court that there *is* sufficient evidence in the record to support the town's decision and the reasons given for that decision. By contrast, in a traditional zoning appeal, the scope of review requires the appealing aggrieved party to marshal the evidence in the record, and to establish that the decision was *not* reasonably supported by the record. *Protect Hamden/North Haven from Excessive Traffic & Pollution, Inc.* v. *Planning & Zoning Commission*, 220 Conn. 527, 542–43, 600 A.2d 757 (1991).[9]

Third, if a town denies an affordable housing land use application, it must state its reasons on the record, and that statement must take the form of "a formal, official, collective statement of reasons for its actions." Id., 544.[10] By contrast, in a traditional zoning appeal, if a zoning agency has failed to give such reasons, the court is obligated "to search the entire record to find a basis for the [agency's] decision." (Internal quotation marks omitted.) Id.

---

[8] This does not mean, however, that the provisions of § 8-30g preclude a traditional zoning appeal by a different aggrieved person. Subsection (e) of § 8-30g specifically provides that "[n]othing in this section shall be deemed to preclude any right of appeal under the provisions of sections 8-8, 8-9, 8-28, 8-30, or 8-30a." It does mean, however, that it is only when an unsuccessful applicant appeals under § 8-30g (b) that the appeal triggers the special provisions regarding the scope of judicial review provided by § 8-30g (c).

[9] We discuss in more detail in part I B of this opinion the nature of a town's appellate burden in affordable housing land use appeals.

[10] In *West Hartford Interfaith Coalition, Inc.* v. *Town Council*, supra, 228 Conn. 516 n.18, we did not reach the question of "whether the statute requires the [town] to [state its reasons]." We now decide that question because, although it is not absolutely necessary to do so on the facts before us, since the defendant did state its reasons in a formal, official and collective manner, we believe that both affordable housing applicants and towns should have the guidance that the answer to this question provides.

We reach this conclusion based on the text and the purpose of the statute.[11] The text requires that the town establish that sufficient record evidence supports "the decision from which such appeal is taken *and the reasons cited for such decision . . . .*" (Emphasis added.) General Statutes § 8-30g (c) (1) (A). Thus, textually the statute contemplates "reasons" that are "cited" by the town. This strongly suggests that such reasons be cited by the zoning agency at the time it took its formal vote on the application, rather than reasons that later might be culled from the record, which would include, as in a traditional zoning appeal, the record of the entire span of hearings that preceded the vote. Furthermore, the statute requires that the town establish that: its "decision [was] necessary to protect substantial public interests in health, safety, or other matters which the [agency] may legally consider"; General Statutes § 8-30g (c) (1) (B); those "interests clearly outweigh the need for affordable housing"; General Statutes § 8-30g (c) (1) (C); and those "public interests cannot be protected by reasonable changes" to the plan. General Statutes § 8-30g (c) (1) (D). These requirements strongly suggest that the town be obligated, when it renders its decision, to identify those specific public interests that it seeks to protect by that decision, so that the court in reviewing that decision will have a clear basis on which to do so. Furthermore, "the key purpose of § 8-30g is to encourage and facilitate the much needed development of affordable housing throughout the state." *West Hartford Interfaith Coalition, Inc.* v. *Town Council,* supra, 228 Conn. 511. Requiring the town to state its reasons on the record when it denies an affordable housing land use application will further that purpose because it will help guard against possibly pretextual denials of such applications. We therefore read

[11] Our search of the legislative history has not disclosed any evidence of legislative intent bearing intelligibly on this question.

the statute, consistent with its text and purpose, to require the town to do so.

## B

We first consider the scope of our review of the defendant's decision.[12] The plaintiff claims that, although § 8-30g (c) (1) (A)[13] requires only that the defendant prove that its decision and the reasons for it be supported by "sufficient evidence in the record," the defendant has a higher burden under § 8-30g (c) (1) (B) and (C).[14] More specifically, the plaintiff argues that the defendant's burden under subparagraphs (B) and

[12] Because the plaintiff's appeal to the trial court is based solely on the record, the scope of the trial court's review of the defendant's decision and the scope of our review of that decision are the same.

[13] Section 8-30g (c) requires that, in an affordable housing land use appeal, "the burden shall be on the commission to prove, based on the evidence in the record compiled before such commission that (1) (A) the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record . . . ." See footnote 2 of this opinion.

[14] Pursuant to § 8-30g (c) (1), the zoning commission has the appellate burden to establish, based upon the evidence in the record, that "(B) the decision is necessary to protect substantial public interests in health, safety, or other matters which the commission may legally consider; [and] (C) such public interests clearly outweigh the need for affordable housing . . . ." See footnote 2 of this opinion.

The plaintiff also argues that, to the extent that what it refers to as dicta in *Kaufman* v. *Zoning Commission*, 232 Conn. 122, 653 A.2d 798 (1995), and *West Hartford Interfaith Coalition, Inc.* v. *Town Council*, supra, 228 Conn. 498, "can be read to authorize the application of a 'sufficiency of the evidence' standard to all four prongs of the statute, they should be reconsidered." In addition, the amicus curiae appears to argue that the sufficiency of the evidence standard, under the first prong of the statute, means something more than what this court stated its meaning to be in *Kaufman* and *West Hartford Interfaith Coalition, Inc.* The amicus also argues that our conclusion in *Kaufman* that the sufficiency of the evidence standard applies to legislative decisions of zoning commissions acting on affordable housing applications was "only dicta," and should not be applied in the present case. We decline to reconsider those aspects of *Kaufman* and *West Hartford Interfaith Coalition, Inc.*, because, as we explain in the text of this opinion, the statements in those cases are not dicta but holdings, and we are convinced that both cases were decided correctly.

(C) is a preponderance of the evidence standard. With respect to subparagraph (D) of § 8-30g (c) (1),[15] however, the plaintiff contends that "the remarkable aspect of this requirement arises not so much from the level of the burden of proof as from where that burden falls. . . . The requirement that a commission prove that the public interests *cannot* be protected means that it must take an active role. The commission must become familiar enough with the application to make a good faith attempt to devise reasonable changes to the development to protect the public interests that it perceives to be threatened." (Emphasis in original.)

We disagree with the plaintiff's contentions regarding subparagraphs (B), (C) and (D) of § 8-30g (c) (1). We conclude that the defendant's burden under those subparagraphs is the same as that under subparagraph (A), namely, to establish that its decision and the reasons cited in support of that decision are supported by sufficient evidence in the record. With respect to subparagraph (D) more specifically, however, we conclude that where the zoning commission establishes that there is sufficient evidence in the record to support its determination that there is a substantial public interest that would be harmed by the proposed affordable housing development, and where that interest and harm are site specific, in the sense that *no* changes to the proposed development reasonably can be determined to protect that interest on that specific site, the zoning commission has satisfied its burden. Because we conclude, moreover, that in the present case the defendant has satisfied its burden under subparagraph (D), we need not decide whether, and to what extent, it had an obligation to devise potential changes to the proposed development, rather than to deny the application.

---

[15] Section 8-30g (c) (1) requires the zoning commission to prove, based on the evidence in the record, that "(D) such public interests cannot be protected by reasonable changes to the affordable housing development . . . ." See footnote 2 of this opinion.

It is useful to begin this analysis by differentiating between two different, but related concepts: (1) a burden of persuasion; and (2) the scope of judicial review of an administrative decision, including a zoning decision. The concept of a burden of persuasion ordinarily applies to questions of fact, and ordinarily is expressed in one of three ways: (1) a preponderance of the evidence; (2) clear and convincing evidence; or (3) proof beyond a reasonable doubt. See C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) §§ 4.4.1, 4.4.2, pp. 72–76. The function of the burden of persuasion is to allocate the risk of error on certain factual determinations, and to indicate the relative social importance of the factual determination at issue. *Miller* v. *Commissioner of Correction*, 242 Conn. 745, 791–94, 700 A.2d 1108 (1997). In a zoning case, the fact finder ordinarily is the zoning agency, not the court.

The concept of the scope of judicial review of an administrative decision, by contrast, applies to both the factual and legal decisions made by the administrative agency in question, including a zoning agency, and ordinarily differs depending on whether the court is reviewing a factual or legal determination by the agency. See, e.g., *Connecticut Resources Recovery Authority* v. *Zoning Board of Appeals*, 225 Conn. 731, 744, 626 A.2d 705 (1993) ("trial court must uphold the board's decision [regarding factual determinations] if it is reasonably supported by the record"); *North Haven* v. *Planning & Zoning Commission*, 220 Conn. 556, 561, 600 A.2d 1004 (1991) (applying plenary review to question of law). The function of the scope of judicial review is to express the policy choice, ordinarily drawn from the governing statutes, regarding the allocation of decision-making authority as between the administrative agency and the reviewing courts, and, more specifically, to articulate the degree of constraint that the

statutes place upon the courts in reviewing the administrative decision in question. Where the administrative agency has made a factual determination, the scope of review ordinarily is expressed in such terms as substantial evidence or sufficient evidence. See, e.g., *Property Group, Inc.* v. *Planning & Zoning Commission*, 226 Conn. 684, 692, 628 A.2d 1277 (1993) (agreeing that lack of "substantial evidence" in record warranted Appellate Court's determination); see also General Statutes § 4-183 (j).[16] Where, however, the administrative agency has made a legal determination, the scope of review ordinarily is plenary. See, e.g., *North Haven* v. *Planning & Zoning Commission*, supra, 561.

In the present case, the scope of review, not the burden of persuasion, is at issue. Although § 8-30g (c) uses language slightly suggestive of fact-finding,[17] albeit inaccurately, the zoning commission remains the fact finder, as in a traditional zoning case, and there is nothing but a minimal linguistic inaccuracy to indicate otherwise. The court's function in an appeal under § 8-30g (c) (1) is to apply the scope of judicial review, as expressed in subparagraphs (A), (B), (C) and (D), to

---

[16] General Statutes § 4-183 (j) provides: "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) In violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and *substantial evidence* on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. If the court finds such prejudice, it shall sustain the appeal and, if appropriate, may render a judgment under subsection (k) of this section or remand the case for further proceedings. For purposes of this section, a remand is a final judgment." (Emphasis added.)

[17] For example, in an appeal from the denial of an affordable housing land use application, § 8-30g (c) (1) places a "burden" on the zoning commission to "prove" the criteria set forth in subparagraphs (A), (B), (C) and (D).

the pertinent determinations made by the zoning commission. Put another way, the statute contemplates that the zoning commission will have made certain factual determinations in the zoning proceedings, and the court is obligated to review those factual determinations pursuant to the scope of review stated in the statute. Indeed, to read § 8-30g (c) as encompassing a shift of the fact-finding function from the local zoning agency to the court would be a radical departure from basic principles of zoning law. We ordinarily do not read statutes to make radical departures from traditional rules without a clear indication of legislative intent to do so. See, e.g., *Castagno* v. *Wholean*, 239 Conn. 336, 340, 684 A.2d 1181 (1996) (construing statute to avoid "radical departure from the common law and from the deeply ingrained tradition"). There is no such indication in the language of § 8-30g (c) and, as we discuss in more detail later in this opinion, the legislative history is to the contrary.

With this background in mind, we return to the question of our scope of review under § 8-30g (c) (1) of the defendant's decision denying the application. We note in this connection that, with respect to all of the subparagraphs—(A) through (D)—judicial review of the decision is "based upon the evidence in the record compiled before [the] commission . . . ." General Statutes § 8-30g (c). Thus, as in a typical zoning appeal, the court's function in the present case is to review the record made in the zoning proceeding.[18]

---

[18] We need not decide whether the trial court has the authority, under § 8-30g, to take additional evidence. Compare § 8-30g (c) (providing that zoning commission is to establish four criteria of subdivision [1] "based upon the evidence in the record compiled before [the zoning] commission"), with § 8-30g (b) (providing that "[e]xcept as otherwise provided in this section, appeals involving an affordable housing application shall proceed in conformance with the [provision] of [section] 8-8 . . . as applicable"), and General Statutes § 8-8 (k) (providing for authority in court to take additional testimony when it "is necessary for the equitable disposition of the appeal").

The question of our scope of review under § 8-30g (c) (1) implicates the question of the relationship between subparagraphs (A), (B), (C) and (D). We conclude that subparagraph (A) states the general scope of review, drawn largely from traditional zoning principles, that applies to subparagraphs (B), (C) and (D).

We first address our scope of review under subparagraph (A), which requires the defendant to establish that "the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence . . . ." We address this aspect of our scope of review because, although the plaintiff does not challenge or seek to change its established meaning in this appeal, we conclude that in effect the four subparagraphs are inextricably linked, and that the general standard of the sufficiency of the evidence applies to subparagraphs (B), (C) and (D).

We first considered our scope of review under General Statutes (Rev. to 1993) § 8-30g (c) in *West Hartford Interfaith Coalition, Inc.* v. *Town Council,* supra, 228 Conn. 498. In the context of a legislative zone change, we held that "the trial court properly applied traditional concepts of judicial review, where appropriate, to its review of the [town council's] decision." Id., 512. In doing so, we reaffirmed and applied two of those traditional concepts that are pertinent to this appeal.

The first concept was that, when the zoning commission acts in its legislative capacity, its conclusions "must be upheld . . . if they are reasonably supported by the record. The credibility of the witnesses and the determination of [questions] of fact are matters solely within the province of the [commission]. . . . The question is not whether the trial court would have reached the same conclusion, but whether the record before the [commission] supports the decision reached." (Internal quotation marks omitted.) Id., 513. We then applied this

standard of review, and concluded "that the trial court did not substitute its judgment for that of the [town council] regarding the density of the site." Id., 516.

Second, we reaffirmed the concept that "[w]here a zoning [commission] has stated its reasons for its actions, the court should determine only whether the assigned grounds are reasonably supported by the record and whether they are pertinent to the considerations which the authority was required to apply under the zoning regulations." (Internal quotation marks omitted.) Id., 513. Furthermore, "[t]he zone change must be sustained if even one of the stated reasons is sufficient to support it." (Internal quotation marks omitted.) Id. We then applied this standard and concluded "that the trial court in fact searched the record and was unable to find a basis to justify the [town council's] decision . . . ." Id., 517–18.

Thereafter, in *Kaufman* v. *Zoning Commission*, 232 Conn. 122, 653 A.2d 798 (1995), we again addressed the scope of judicial review, under General Statutes (Rev. to 1993) § 8-30g (c), of the denial of a change of zone application for an affordable housing development. We articulated and applied two standards that are pertinent to the present case.

First, we held that, under General Statutes (Rev. to 1993) § 8-30g (c) (1),[19] with regard to the question of

---

[19] When *Kaufman* was decided, General Statutes (Rev. to 1993) § 8-30g (c) had a slightly different structure from the current revision of that statute: the 1993 revision was not divided into two subdivisions, namely, (1) (A), (B), (C) and (D), and (2) (A) and (B), as the current version is. See footnote 2 of this opinion. At the time of *Kaufman*, subsection (c) was divided into subdivisions (1), (2), (3) and (4), corresponding to what is now subsection (c) (1) (A), (B), (C) and (D). Thus, for example, what the court in *Kaufman* referred to as "§ 8-30g (c) (2)"; *Kaufman* v. *Zoning Commission*, supra, 232 Conn. 154; is now § 8-30g (c) (1) (B).

Section 8-30g (c) now requires the zoning commission in question to establish, "based upon the evidence in the record compiled before such commission that (1) (A) the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record . . . ." See footnote 2 of this opinion.

whether the zoning commission was required to establish that there was "sufficient" or "substantial" evidence in the record to support its decision, "the correct test is whether [the commission] met the lesser burden of adducing 'sufficient evidence' to support its decision." *Kaufman* v. *Zoning Commission*, supra, 232 Conn. 150. "The commission's only burden was to show that the record before the [commission] support[ed] the decision reached; *West Hartford Interfaith Coalition, Inc.* v. *Town Council*, supra, [228 Conn.] 513; and that the commission did not act arbitrarily . . . illegally . . . or in abuse of discretion." (Internal quotation marks omitted.) *Kaufman* v. *Zoning Commission*, supra, 153.

We further defined "sufficient evidence" in this context to mean less than a preponderance of the evidence, but more than a mere possibility. We stated that the zoning commission need not establish that the effects it sought to avoid by denying the application "are definite or more likely than not" to occur, but that such evidence must establish more than a "mere possibility" of such occurrence. Id., 156. Thus, "the commission was required to show a reasonable basis in the record for concluding [as it did]. The record, therefore, must contain evidence concerning the potential harm that would result if the zone were changed . . . and concerning the probability that such harm in fact would occur." Id.[20] We then applied this standard and concluded that "none of the evidence [in the record] provided a reasonable basis on which to deny the

[20] In *Kaufman*, we referred to some of the legislative history in support of our interpretation of the meaning of "sufficient evidence in the record." See *Kaufman* v. *Zoning Commission*, supra, 232 Conn. 152–53 n.20 ("As Representative Richard D. Tulisano explained, the term 'sufficient evidence' . . . means '[e]nough evidence for one to reach a particular conclusion. . . . I think that they will have to have something on the record that third parties can look at in an objective manner and reach the same conclusion. It is not a very high standard whatsoever, and so I think the Representative is correct that [it] is just a matter of fact that something has to be there and they will have sustained their burden.' 32 H.R. Proc., Pt. 30, 1989 Sess., p. 10579.").

application"; id., 160; because "there is nothing in the

We now take this opportunity to reaffirm that interpretation. Indeed, there is ample other legislative history that supports our prior interpretation. See, e.g., 32 H.R. Proc., supra, pp. 10,578–79, colloquy between Representatives Tulisano and Dale W. Radcliffe ("sufficient evidence" does not mean preponderance of evidence or more probable than not); id., p. 10,600, remarks of Representative William J. Cibes, Jr. (proposal "is a form of judicial review of land use decisions, which merely extends the judicial review, which is already in place"); id., pp. 10,619–22, colloquy between Representatives Cibes and William H. Nickerson (intent of amendment of initial bill from "substantial" to "sufficient" evidence was to effect "a lower standard than substantial evidence"; "to lower the burden of proof for the community"; "to ratchet down the level of interest that is required for the commission to demonstrate that it is correct"); id., pp. 10,673–74, remarks of Representative Miles S. Rapoport ("The bill that's before us today was not the original proposal of the [Blue Ribbon Commission on Housing; Public Acts 1987, No. 87-550, § 4 (a);] and certainly not of the subcommittees of the commission that worked on it. The original proposal was a much stronger proposal. To hear some of the rhetoric directed at today's, at this bill, and in particular, at this amendment, you'd think that we were proposing a state authority with the power to override Zoning Board decisions. That kind of body in fact exists in Massachusetts and in fact was seriously considered by the Blue Ribbon Commission, but rejected as something that here in the land of steady habits would be too strong and too much of a departure from our ways and so the proposal got watered down just to a body that could be appealed to and then watered down further to judicial review with a small change from current law that the burden of proof for the denial of an affordable housing project rests with the town as opposed to with the people who want to build affordable housing. It seems to me that this is the smallest step that we can take. It is hardly a major departure from constitutional norms or from the freedom of choice that exists for towns. It is a small step in putting forward that the towns have to be able to show that they have considered and rejected the need for affordable housing before they make a decision. I don't think that's very much of a burden to ask.").

The Senate legislative history is to the same effect. See, e.g., 32 S. Proc., Pt. 12, 1989 Sess., p. 4048, remarks of Senator Richard Blumenthal, the floor sponsor of the bill ("[this bill] sets a standard of review that places a reasonable burden on that land use agency to justify on the record and from its own record why an adverse decision is made with respect to a specific project . . . and do[es] not provide for any kind of general zoning override"); id., p. 4049 ("Modifications have been made and I should stress, significant modifications, by the House Amendment to take [account] of the concerns that have been raised by localities with respect to the possible ramifications of this legislation. The standard of review has been changed. Very significantly been changed, so that only sufficient evidence, not substantial evidence as was in the file copy, but only sufficient evidence must be

record that supports anything but a mere possibility that the requested zone change would" cause the harm that the commission envisaged by the zone change. (Internal quotation marks omitted.) Id., 162.

Second, we implicitly recognized the relationship between then subdivisions (1) and (2) of General Statutes (Rev. to 1993) § 8-30g (c) by applying the "sufficient evidence" standard, as articulated under subdivision (1), to subdivision (2) as well. In effect, we read the general language of General Statutes (Rev. to 1993) § 8-30g (c) (1)—"the decision . . . and the reasons cited for such decision are supported by sufficient evidence in the record"—to apply to the more specific requirement of General Statutes (Rev. to 1993) § 8-30g (c) (2) that "the decision is necessary to protect substantial public interests in health, safety, or other matters which the commission may legally consider . . . ." See *Kaufman* v. *Zoning Commission*, supra, 232 Conn. 154.

We began this analysis in *Kaufman* by outlining the zoning commission's burden under General Statutes

produced to justify the land use body decision."); id., p. 4953 ("In our consideration of various standards of proof and procedures we considered others. But since the review is one that is made on the basis of the existing record, not a trial de novo, we felt that it was appropriate for the land use body to bear the burden, simply of showing in the record what the basis was for its decision . . . .").

Senator Blumenthal also stated: "I think that we would be remiss if we didn't at some point in this debate make clear for purposes of legislative intent the strong concern that many of us feel, both supporters and opponents that the judicial review procedure be sensitive to local interests and needs and concerns and that under the rubric of the interests that are legitimately to be considered that judges be extremely sensitive to those interests and whatever other legitimate interests may be presented by way of public health, safety and other matters, including for example, related to education or transportation congestion and the like, that is the basis and the condition on which many of the Circle will vote for this legislation and reflecting the concerns that have been voiced by Senator [Kevin] Sullivan and others, the anticipation of this Legislature and this Body is that there will be sensitivity to those concerns, that not only suburban and rural but also urban areas will be given that deference to the extent that it is justifiable under the burden of [proof] to which towns may be subjected." Id., p. 4072.

(Rev. to 1993) § 8-30g (c) (2), now § 8-30g (c) (1) (B). "[T]the commission was required to show that, on the basis of 'the evidence in the record . . . the decision [was] necessary to protect substantial public interests . . . .' " *Kaufman* v. *Zoning Commission,* supra, 232 Conn. 154. We then explained that this imposed two burdens on the zoning commission. "First, the commission was required to establish that *it reasonably could have concluded* that 'substantial public interests' were implicated by the zone change, *in light of the record evidence* as to both the level of harm that could result from the zone change and the probability that the zone change would cause that harm. Second, the commission was required to establish that, *on the basis of the record, it reasonably could have concluded* that the decision to deny the zone change was 'necessary'—i.e., that any such public interests could not be protected if the zone change were granted." (Emphasis added.) Id.

We then stated our disagreement with the zoning commission's contention that it "was entitled to reject this plaintiff's application based on the mere possibility that the zone change would harm the [watershed property]. . . . [T]he commission was required to show a reasonable basis in the record for concluding that its decision was necessary to protect substantial public interests. The record, therefore, must contain evidence concerning the potential harm that would result if the zone were changed . . . and concerning the probability that such harm in fact would occur." Id., 156. After reviewing the evidence in the record, we then concluded that "there is nothing in the record that supports anything but a mere possibility that the requested zone change would harm the environment. The record contains no evidence quantifying the potential level of harm to the [watershed property] or estimating the probability that the harm would occur if the zone change were granted." (Internal quotation marks omitted.) Id., 162.

This analysis demonstrates that, in interpreting and applying what is now subparagraph (B) of § 8-30g (c) (1) in *Kaufman*, we applied the same standard that we previously had delineated as defining the phrase "sufficient evidence in the record" under subparagraph (A) of § 8-30g (c) (1). Our focus on what the zoning commission reasonably could have concluded on the basis of the record evidence, as opposed to what was a mere possibility on the basis of that evidence, was drawn directly from our analysis of the meaning of "sufficient evidence in the record" under subparagraph (A). Put another way, in determining whether the commission had sustained its burden under subparagraph (B) of establishing that its decision was "necessary to protect substantial interests in health, safety, or other matters which the commission may legally consider," the court does not itself weigh the record evidence. Instead, the court applies the "sufficient evidence in the record" test of subparagraph (A). The court reviews the evidence and asks whether there was sufficient evidence for the *commission*, based on that evidence, reasonably to have concluded that there was some probability, not a mere possibility, that its decision was necessary to protect those interests.

We are persuaded, moreover, that we were correct, in *Kaufman*, in applying the meaning of "sufficient evidence in the record" under subparagraph (A) of § 8-30g (c) (1) to subparagraph (B) of § 8-30g (c) (1), and that the same analysis applies to subparagraphs (C) and (D) of § 8-30g (c) (1) as well. In other words, the court's task in determining whether the zoning commission has satisfied its burden under subparagraphs (C) and (D), is not to weigh the evidence itself. The court's task rather, is to review the evidence and determine whether, based upon that evidence, there was sufficient evidence for the commission reasonably to have concluded that: (1) the "public interests" that the commission sought to protect "clearly outweigh the need for

affordable housing"; General Statutes § 8-30g (c) (1) (C); and (2) "such public interests cannot be protected by reasonable changes to the affordable housing development . . . ." General Statutes § 8-30g (c) (1) (D). We reach this conclusion for several reasons.

First, although § 8-30g (c) (1) is phrased as if subparagraph (A) were separate and independent of subparagraphs (B), (C) and (D), a careful analysis of the entire subsection strongly suggests that, to the contrary, the "sufficient evidence in the record" standard of subparagraph (A) must also apply to subparagraphs (B), (C) and (D). Subparagraph (A) refers to the "decision" of the zoning commission and "the reasons cited for such decision," and requires that the decision and those reasons be "supported by sufficient evidence in the record." Textually, subparagraphs (B), (C) and (D) then build on that standard by referring to the "decision" and by requiring the commission to establish that the decision was "necessary to protect substantial public interests"; General Statutes § 8-30g (c) (1) (B); that those "public interests clearly outweigh the need for affordable housing"; General Statutes § 8-30g (c) (1) (C); and that "such public interests cannot be" otherwise protected. General Statutes § 8-30g (c) (1) (D). Each of the four subparagraphs, therefore, inextricably is linked textually with the others.

Furthermore, as the present case demonstrates, those very reasons are themselves ordinarily what the zoning commission will state under subparagraphs (B), (C) and (D) of § 8-30g (c) (1) as the justification for its decision. In this case, the defendant, in giving its reasons for its decision to deny the application, gave reasons that were phrased in terms of subparagraphs (B) and (C) explicitly, and (D) implicitly. The defendant explicitly cited the public interests in traffic safety, water supply preservation and open space; it explicitly concluded that these interests outweighed the need

for public housing; and it implicitly concluded that no reasonable changes to the proposed development could protect those interests. The legislature undoubtedly contemplated that, in the typical case, subparagraph (A) would provide the scope of review for subparagraphs (B), (C) and (D).

Second, each of the four subparagraphs is preceded by the generally applicable phrase, "the commission to prove, based upon the evidence in the record compiled before [it] . . . ." General Statutes § 8-30 (c) (1). The purpose of this provision is to make clear that judicial review must be based on the zoning record returned to the court—not on the basis of a trial de novo. This conclusion is buttressed by the legislative history. See 32 H.R. Proc., Pt. 30, 1989 Sess., p. 10,578, remarks of Representatives Dale W. Radcliffe and Richard D. Tulisano ("[the phrase] in the record compiled before the commission . . . is designed to make sure there is no trial de novo"); 32 S. Proc., Pt. 12, 1989 Sess., p. 4053, remarks of Senator Richard Blumenthal ("the review is one that is made on the basis of the existing record, not a trial de novo"). This generally applicable scope of review provision strongly supports the conclusion that each of the subparagraphs of § 8-30g (c) (1) embodies the "sufficient evidence" standard, because that is the only standard for judicial scope of review established by the statute, and because to conclude otherwise would require a review that would be virtually identical to a trial de novo by the court.

Third, the legislative history supports our conclusion that the standard of "sufficient evidence in the record," articulated explicitly in subparagraph (A) of § 8-30g (c) (1), also applies under the other subparagraphs. In a colloquy with Representative Tulisano, the floor sponsor of the bill, Representative Radcliffe, stated, without contradiction, as follows: "[A]s I read [subsection (c)] and then I think it's a correct reading, the municipality

would have the burden of going to court and proving by sufficient evidence that standard that's developed in the record that these several factors are met, that is, decisions necessary to protect health, safety and welfare, public interest, should outweigh the need for affordable housing." 32 H.R. Proc., supra, p. 10,580.

Fourth, as we have explained, in *Kaufman*, we already have applied, and thus implicitly deemed applicable, the scope of review under subparagraph (A) of § 8-30g (c) (1) to subparagraph (B). There is no basis in the statutory language or history to warrant the application of a different scope of review under subparagraphs (C) and (D).

## II

Having explicated our scope of review of the defendant's decision, we turn to the plaintiff's specific challenges to the trial court's judgment affirming that decision. Applying the appropriate scope of review, we affirm that decision.

## A

The plaintiff's first claim is that the trial court did not determine whether the defendant had met all four of the requirements of § 8-30g (c) (1). Specifically, the plaintiff argues that the trial court "dismissed the plaintiff's appeal without finding that the record evidence satisfied each prong of § 8-30g (c) [1] . . . ." We disagree.

This claim is premised on a misreading of the trial court's memorandum of decision. The court specifically stated that it found "that the [defendant's] decision is supported by sufficient evidence in the record, *and otherwise complies with the requirements of § 8-30g (c) [1].*" (Emphasis added.) The court further stated that, because of this conclusion, "it is not necessary to discuss more than one reason given by the [defendant]

which meets the requisite standard." The court then focused on the defendant's "concern over endangerment of a potential future water supply," and concluded, based on the court's evaluation of the entire record, that the defendant "was justified in denying the application because the proposed development may destroy a potential future source of public water." The court then turned to the remaining three requirements of § 8-30g (c) (1). It concluded that its "foregoing discussion of § 8-30g (c) (1) [A] encompasses, in large measure, [subparagraph (B)] as well. That the defendant is free to consider endangerment of a potential future source of public water, as 'a substantial public interest in health, safety or other matters which the [the defendant] may consider' is beyond cavil." Regarding § 8-30g (c) (1) (C), the trial court considered the statement of the defendant's fifth reason, namely, that " 'these considerations outweigh the need for affordable housing at this site, especially because of the availability of other parcels in town suitable for affordable housing' . . . as a proper statement of the balancing required by § 8-30g (c) [(1) (C)]." With respect to § 8-30g (c) (1) (D), the trial court specifically "accept[ed] the [defendant's] argument that loss of a potential public water supply is both a site specific issue and one which is implicated by development with or without 'reasonable changes.' " Therefore, the trial court considered each prong of § 8-30g (c) before concluding that the defendant's denial of the application was justified.

## B

The plaintiff next claims that the trial court improperly failed to consider each of the reasons advanced by the defendant in denying the application. The plaintiff argues that, because the key purpose of the statute is to encourage and facilitate the development of affordable housing in the state, a reviewing court must "consider

all of the zoning agency's reasons for denial of an application. If the court determines that some of the reasons are invalid, then the matter should be remanded back to the agency because there is no way of knowing whether the invalid reasons infected the entire decision." In effect, this claim challenges our conclusion, articulated in *West Hartford Interfaith Coalition, Inc.* v. *Town Council*, supra, 228 Conn. 513, that under § 8-30g (c) (1), " '[t]he zone change must be sustained if even one of the stated reasons is sufficient to support it.' " We are not persuaded.

There can be no doubt that, under traditional notions of judicial review of legislative zoning decisions, it is settled law that a zone change must be sustained if one of the stated reasons is supported by sufficient evidence. See id.; *Protect Hamden/North Haven from Excessive Traffic & Pollution, Inc.* v. *Planning & Zoning Commission*, supra, 220 Conn. 544; *First Hartford Realty Corp.* v. *Plan & Zoning Commission*, 165 Conn. 533, 543, 338 A.2d 490 (1973). Traditional concepts of judicial review of zoning decisions apply to appeals from denials of affordable housing applications, where appropriate. *West Hartford Interfaith Coalition, Inc.* v. *Town Council*, supra, 228 Conn. 512. The plaintiff does not point to any language in § 8-30g (c) (1) as support for its interpretation of the statute, and we perceive none. We reaffirm, therefore, that an affordable land use decision is sustainable if any one of the reasons stated by the zoning agency is supported by sufficient evidence in the record, the standard articulated by subparagraph (A) of § 8-30g (c) (1), and properly applied to subparagraphs (B), (C) and (D).

Furthermore, the legislative history of § 8-30g (c) (1) makes clear that, except insofar as the statute specifies otherwise, such as we have indicated previously, traditional concepts of judicial review are to prevail. See footnote 20 of this opinion. There is nothing in that

legislative history to suggest that the legislature intended to supplant this particular traditional aspect of judicial review. Indeed, the legislative history is replete with indications that, except insofar as the statute requires otherwise, either explicitly or implicitly, the legislature intended the process to be the same as in traditional zoning cases.[21]

In addition, the rule that the plaintiff proposes would discourage zoning agencies from fully articulating their reasons in denying an application. If, whenever an agency gave its reasons and, on judicial review, one of those reasons was determined not to be supported by sufficient evidence—for example, by evidence showing only a possibility but not a probability of harm to a protected interest—the entire case would have to be remanded for a redetermination by the agency. Under such a regimen, in the case of a close call on any given reason in the first instance, there would be an undue incentive for the agency to exclude that reason from its decision, because it would create a risk of reversal by the court and a subsequent reweighing process by the agency, long after it had rendered the original decision. We do not think that the legislature intended to create such a disincentive because public policy is better served by encouraging, rather than discouraging, a public agency to express all of the reasons for its decisions.

The plaintiff contends that the "public policy embodied in § 8-30g of providing fair access to housing and

---

[21] Although the plaintiff does not make the argument, it might be argued that the requirement in § 8-30 (c) (1) (C) that "such public interests clearly outweigh the need for affordable housing"; (emphasis added); supports the proposition that the court must examine *all* of the stated reasons for evidentiary sufficiency. We are not persuaded, however, that this use of the plural, rather than, for example, "such public *interest or* interests," was intended by the legislature to signify a departure from the traditional principle that if one stated reason is supported by the record the zoning decision must be sustained. The legislative history belies such an intent.

expanding housing opportunities for all citizens of Connecticut makes the application of this rule inappropriate in affordable housing appeals." We agree with this statement of the public policy animating § 8-30g. We disagree, however, that this policy requires or justifies, in the absence of appropriate legislative language and in the face of contrary legislative history and public policy, an interpretation of the statute that embodies the rule that the plaintiff urges.

C

The plaintiff's final claim is that the defendant did not meet its burdens under § 8-30g (c) (1). We disagree.

The defendant gave three substantive reasons for its decision that are in contention in this appeal.[22] They may be summarized as: (1) traffic hazards; (2) preservation of open space; and (3) endangerment of a potential future public water supply. The trial court focused on the third reason, namely, endangerment of a potential future water supply. We focus on the second reason, namely, the preservation of open space, because in our view, of the three reasons, the record evidence supporting that reason most clearly satisfies the defendant's burdens under the statute.[23] We reiterate that our scope of review of the defendant's decision denying the plaintiff's application is the same as that of the trial court. See footnote 12 of this opinion.

The defendant's second reason was: "It is in the best interest of the Town to provide open space in order to

---

[22] See footnote 5 of this opinion and accompanying text.

[23] This conclusion renders it unnecessary to determine whether the defendant has met its burdens with respect to the other two reasons. Therefore, we express no opinion on the sufficiency of the evidence regarding either the traffic hazards or the threat to a potential water supply, purportedly engendered by the plaintiff's application. Furthermore, we do not decide whether, as the plaintiff suggests, the defendant had an obligation, instead of denying the application outright, to initiate a dialogue with the plaintiff in order to determine whether these reasons could have been accommodated by reasonable changes to the plaintiff's plan.

meet local and regional needs. Further, the 1994 Town Plan of Development recommends that [Metropolitan] lands in the Keeney Street area be considered for Town purchase and preservation as open space." In order to satisfy its burden under § 8-30g (c) (1) with respect to this reason, the defendant must satisfy several requirements.

Pursuant to subparagraph (B) of § 8-30g (c) (1), it must establish that there was sufficient evidence in the record for it reasonably to have concluded that the "substantial public [interest]" in the preservation of open space[24] was "necessary to protect [such] public [interest] . . . ." Under *Kaufman* v. *Zoning Commission*, supra, 232 Conn. 122, this means that the defendant must establish that it reasonably could have concluded, based on the record evidence, that (1) there was some quantifiable probability—more than a mere possibility but not necessarily amounting to a preponderance of the evidence—that the legitimate preservation of open space would have been harmed by the zone change, and (2) the preservation of open space could not be protected if the zone change were granted.

Pursuant to subparagraph (C) of § 8-30g (c) (1), the defendant must establish that there was sufficient evidence in the record for it reasonably to have concluded that the public interest in preserving open space "clearly outweigh[ed] the need for affordable housing . . . ."

---

[24] The plaintiff does not contend that the preservation of open space is not a "substantial public [interest] . . . which the commission may legally consider . . . ." General Statutes § 8-30g (c) (1) (B). Indeed, that would be a difficult contention to sustain, in light of the strong statutory policies in favor of the preservation of open space in the state. See, e.g., General Statutes § 12-107a ("[i]t is hereby declared . . . that it is in the public interest to encourage the preservation of farm land, forest land and open space land . . . to conserve the state's natural resources and to provide for the welfare and happiness of the inhabitants of the state"); General Statutes § 22-26aa ("the conservation of certain . . . natural drainage areas and open space areas is vital for the well-being of the people of Connecticut").

In both *Kaufman* v. *Zoning Commission*, supra, 232 Conn. 166 n.25, and *West Hartford Interfaith Coalition, Inc.* v. *Town Council*, supra, 228 Conn. 521–22 n.23, we reserved the question of whether "the need for affordable housing" was to be determined on a local or a regional basis. We now address this question, because in the present case the defendant specifically phrased its reasons for denying the plaintiff's application in terms of "the availability of other parcels *in town* suitable for affordable housing." (Emphasis added.) We conclude that the need for affordable housing is to be addressed on a local basis.

Although the language of the statute does not specifically address this question, its legislative history makes clear the legislative intent to confine the inquiry to the specific municipality in which the affordable housing development is to be located. As the affordable housing land use bill originally was reported out of committee and presented to the House of Representatives, it referred to "the need for affordable housing *in the region in which the [affordable] housing development [will be] located, as such need is determined by the regional planning agency [in that] region* . . . ." (Emphasis added.) Substitute House Bill No. 7270, 1989 Sess., Connecticut General Assembly (File No. 598). On the House floor, however, a substitute bill, known as House Amendment Schedule A, was the bill actually considered and enacted by the legislature. Under that bill, the preceding italicized language had been eliminated. This elimination was purposeful. Representative William H. Nickerson inquired of Representative William Cibes, one of the proponents of the bill, regarding the effect of that elimination. Representative Cibes responded: "[T]he intent is to make very clear that it is the municipality's responsibility to care for the housing needs of its citizens and not some broader community."

32 H.R. Proc., supra, p. 10,623. Representative Nickerson then responded to Representative Cibes: "Thank you. So that the effect of the amendment would read the same if it were to say after the words 'affordable housing' if it were to say, though it doesn't say, 'in the town in question' that would put the same meaning on the amendment as does the amendment before us without those words. Is that correct . . . ?" Id. Representative Cibes responded: "I think that is generally the intent." Id. This legislative history compels the conclusion that the legislature intended the need for affordable housing to be determined on the basis of the need for such housing in the local community, as opposed to a regional or statewide basis.[25]

Pursuant to subparagraph (D) of § 8-30g (c) (1), the defendant must establish that there was sufficient evidence in the record for it reasonably to have concluded that the public interest in preserving open space could not have been "protected by reasonable changes to the affordable housing development." It may be that, as the plaintiff argues, in certain cases this provision may require the local zoning agency considering an affordable housing application to disclose to the applicant a substantial public interest that the agency has identified as harmed by the proposed development that could nonetheless be protected by reasonable changes, and to make reasonable efforts with the applicant to see if such changes are feasible, before denying the application on the basis of such a public interest. We need not decide that question here, however, because, we conclude that, where a sufficiently supported reason for denial is site specific, such that no changes to the

---

[25] Moreover, this conclusion is consistent with subsection (f) of § 8-30g, which exempts from the special appeal provisions of the act those *municipalities* in which 10 percent of the housing is either assisted housing, housing financed by the Connecticut Housing Finance Authority, or certain deed restricted housing, irrespective of the need for affordable housing in the regions surrounding such towns.

development reasonably can be contemplated by the agency that will protect the substantial public interest that the agency has identified, that circumstance will satisfy the commission's obligation under subparagraph (D). This conclusion follows from the statutory requirement that "such public interests cannot be protected by *reasonable changes* to the affording housing development . . . ." (Emphasis added.) General Statutes § 8-30g (c) (1) (D). If the identified public interest is site specific in the sense that we have stated, then by definition there can be no such reasonable changes to the affordable housing development that will protect the identified interest.

The record contains the following evidence in support of the defendant's decision to deny the application based on the need to preserve open space. Although the parcel in question was denominated as "fringe suburban" on the town's plan of development map, when the plan and zoning commission reported to the defendant, the commission stated: "The 1984 Plan of Development map designates the subject parcel Fringe Suburban. Text portions of the Plan recommend that all [Metropolitan] lands be considered for Town purchase and preservation as open space. Since prior Plan of Development maps have designated all [Metropolitan] owned lands as open space, the designation of the subject parcel as 'Fringe Suburban,' rather than 'Open Space and Watershed' like the rest of the [Metropolitan's] Salmon Brook Reservoir property,[26] is an apparent clerical error." The testimony of the town's community development director before the plan and zoning commission confirmed that it was a clerical error in the 1984 plan of development, based on the fact that, at that time, the zoning map did not have property lines on it and the plan did not intend to separate any

[26] The area in which the parcel is located is known generally as the Salmon Brook Reservoir property.

[Metropolitan] holdings. Furthermore, the 1984 plan contains a written policy statement to "[e]ncourage the continuation of [Metropolitan] open space lands at Keeney Street . . . as Town open space should [Metropolitan] offer said land for sale." In addition, when the conservation commission submitted its statement of concerns to the plan and zoning commission, among those concerns was the following: "The 1970 Plan of Development states in regard to open space needs: 'Should [Metropolitan] or the Manchester Water Company decide to liquidate any of their holdings, the Town or the State should negotiate to purchase some of those areas which have the most significant open space and recreation possibilities.' The 1984 Plan of Development, in its policy statements regarding Public and Quasi-Public Landholdings, states (p. 26): 'Encourage the continued preservation of existing public open space with careful analysis and contingency planning for possible Town acquisition should all or part of [Metropolitan], Town of Manchester Water Company, or State forest lands become available.' (Such contingency planning for [Metropolitan's] Keeney Street property was ordered by the [defendant] early in March, 1994.) And the State's Conservation and Development Policies Plan for 1992–1997 classified [Metropolitan's] holdings in the category of 'Conservation Areas,' as shown on its Locational Guide Map dated May, 1992."

In addition, numerous town residents testified before the defendant to request that the parcel in question be preserved for open space and conservation purposes. That testimony was the continuation of a long history of town efforts to keep the parcel in question, and the larger parcel of Metropolitan property of which it is a part, as open space.

As early as April, 1971, the town unsuccessfully had offered to purchase the specific parcel in question from

Metropolitan, "for permanent open space and conservation purposes," noting further that the "Salmon Brook Reservoir is a most desirable open space resource in the region," and that the "proposed acquisition is part of larger picture. The District owns considerable land in Glastonbury, including the Salmon Brook Reservoir . . . . All of these lands are desirable for open space and conservation uses."

In June, 1972, Daniel W. Lufkin, then commissioner of the state department of environmental protection, had written to Metropolitan requesting that it dedicate the entire Salmon Brook Reservoir property "as an open space or recreational area," either on its own or through a lease of the property to the state for such use "as one element in a circular chain of regional parks serving the Hartford Metropolitan Area."[27] The town, having

[27] In a letter dated June 2, 1972, Lufkin wrote to Metropolitan: "It has come to my attention that [Metropolitan] desires to sell its 630-acre Salmon Brook Reservoir property in Glastonbury and Manchester. As you know, we are greatly concerned over development threats to watershed lands which form a large share of the total open space available along the urban spine of Connecticut running from Hartford to New Haven and thence along the Sound to Greenwich. . . . As you well know, the population of the Greater Hartford area is growing rapidly. In the face of this vast increase, the Capital Region Planning Agency [CRPA] has proclaimed the need for a substantial increase in open space acreage to service this population. A key part of this effort must be to stabilize existing public and quasi-public open space such as the Salmon Brook Reservoir property, shown on both the CRPA and Glastonbury plans of development as open space. Thus I am sure you see our concern when we see a handsome tract of public property only seven miles from downtown Hartford being threatened. When one realizes that there are approximately 400,000 people within a ten-mile radius of this property, this concern understandably increases. In fact, we feel the Salmon Brook Reservoir has great potential as one element in a circular chain of regional parks serving the Hartford Metropolitan area. Therefore I would like to suggest that [Metropolitan] consider dedicating this beautiful property as an open space or recreational area. If [Metropolitan] feels that it cannot take on the responsibility of direct operation, why not consider leasing it to the State for such use? If such a lease could be arranged, I am sure that we could intervene with the towns concerned to remove your existing tax burden."

been sent a copy of the commissioner's letter, responded informing him of the town's unsuccessful attempt either to secure from Metropolitan a permanent conservation and open space easement on the property, or to purchase the property from Metropolitan in order to preserve it as open space.[28] Shortly thereafter, in July, 1972, a town committee formulated two "preference plans" regarding Metropolitan property. The "first preference plan" was to acquire "[t]he entire 600 acre parcel . . . for open space and recreational purposes. This might be accomplished by petitioning the State to purchase the land as State Forest, or via some regional or State-local cooperation. Situated in close proximity to the proposed I-86, this land is readily accessible to the entire Hartford Metropolitan area, and could be developed with lakes, camping, picnicking, athletic areas, bridle paths, nature trails, etc." The "second preference plan" involved only the particular parcel in question in this case. This plan, "in harmony with previous recommendations by the Conservation Commission, consider[ed] the outright acquisition of [the parcel] as essential. The open fields now on this land are ideal for active recreation such as baseball fields, tennis courts, etc. The small dry reservoir could be easily restored and, though it is probably not suitable for swimming, it could lend itself to fishing in the summer

---

[28] By letter dated June 16, 1972, Donald C. Peach, then town manager of Glastonbury, wrote to Lufkin: "Thank you for a copy of your letter of June 2, 1972 to Mr. Edward J. McDonough, Chairman of [Metropolitan], regarding preservation of [Metropolitan] reservoirs in Glastonbury as open space. You may be interested in a previous effort by the Town of Glastonbury to negotiate preservation of these reservoirs as open space. . . . A proposal was made to the administration of [Metropolitan] . . . which proposal consisted of two alternatives: (1) Reduction of taxes to a token amount, such as $1.00 per year, on its reservoir lands in return for a permanent conservation and open space easement. (2) Reduction of taxes as above with no easement but to the difference between the reduced taxes and taxes normally levied to be applied towards purchase by the Town each year of certain previously agreed upon acreage. For various reasons [Metropolitan] was not agreeable to the above. . . ."

and ice skating in the winter . . . . The existing pine forest is ideally suited for a large picnic area because of its natural beauty and its proximity to the aforementioned pond and athletic fields."

In August, 1977, Donald C. Peach, then town manager of Glastonbury, issued a report on the Salmon Brook Reservoir. This report noted that the "issue of the Salmon Brook Reservoir and its disposition goes back a long time. . . . The Town has recognized for some time that the property will not forever stay as open space unless it takes positive action. Either [Metropolitan] will sell or develop the property or it will seek another use for the land." It then reiterated the numerous efforts of the town "to preserve all or parts of the reservoir for public, institutional, or recreational uses, [and] protect it from development." The report also noted that, "[e]xcept for the sale of three parcels, one to the Town for a firehouse, a second to the state for future relocation of Manchester Road, and a third to St. Dunstan's Parish for a church, the reservoir boundaries have remained unchanged for decades." The report concluded by recommending that, with respect to the specific parcel involved in this case, the town acquire it for open space, consistent with the "Second Preference Plan" articulated in July, 1972.

Thus, the defendant had before it a record replete with evidence that, consistently for nearly twenty-five years, beginning at the latest in April, 1971, and continuing to March, 1994, just a few months before the defendant's hearing in this case, the town had viewed the parcel in question, along with the rest of Metropolitan land, as particularly appropriate for open space, conservation and recreational purposes, not only for the residents of the town, but for the greater Hartford area in general. In addition, the record contains ample evidence that this was much more than an idle or passing thought for the town, which had planned for and on several

occasions attempted to purchase the particular parcel in question for those purposes, or encouraged the state to do so as part of a regional plan.

Under § 8-30g (c) (1) (B), this evidence was sufficient for the defendant reasonably to have concluded that there was a quantifiable probability that the interest in the preservation of open space would have been harmed by granting the plaintiff's application, and that this interest could not be protected if the zone change were granted. This probability was more than a mere possibility; it was a certainty. It goes without saying that granting the plaintiff's application for residential development on the parcel in question effectively would have precluded its preservation for open space, conservation and recreational uses.

This is not to say, however, that simply because an affordable housing land use application is for an undeveloped parcel of land that the town will succeed in justifying its denial on the basis of preservation of open space and conservation. We emphasize that, in this case, the parcel in question had a long history of town recognition as particularly appropriate for such uses, and of unsuccessful town efforts to acquire it for those uses. This history precludes any possible inference of pretext on the part of the town, and amply justifies its reliance on the protection of that substantial public interest.

We are not persuaded, moreover, by the plaintiff's reliance on the facts that (1) historically, Metropolitan acquired this parcel separately from the larger parcel located on the other side of Keeney Street, and that the parcel is taxed separately by the town, and (2) this parcel occupies only approximately 5 percent of the total acreage owned by Metropolitan, of which the town already has approved three parcels for nonopen space development. The record sufficiently supports the determination that the town always has viewed the

entire Metropolitan holdings together, for purposes of open space and conservation. Also, the fact that in the past the town has granted permission for three other parcels, far removed from the parcel in this case, for nonopen space uses—for widening Manchester Road, for a town firehouse and for a church—does not preclude the town from adhering to the open space policy for this parcel. In addition, the particular parcel in question has long been viewed by the town as particularly appropriate for such uses, apart from the remainder of Metropolitan holdings. Furthermore, the fact that this parcel is only a small part of the larger open space potential, does not compel the town to eliminate it from its policy in favor of such preservation. The logic of that argument would mean that a town must permit parcel-by-parcel development of land that it otherwise wants to preserve as open space until some finite amount of open space is left. Neither the affordable housing land use act nor our zoning law in general shifts such determinations from the town's legislative body to the court.

Under § 8-30g (c) (1) (C), the defendant must establish that there was sufficient evidence in the record reasonably to have concluded that the public interest in preserving open space clearly outweighed the need for affordable housing in Glastonbury. In its fifth reason, the defendant stated: "These considerations outweigh the need for affordable housing at this site, especially because of the availability of other parcels in town suitable for affordable housing."[29] The following evidence sufficiently supported this determination by the defendant.

---

[29] The trial court concluded that the defendant's failure to include the word "clearly" in its reason did not undermine its compliance with the statutory requirement. The plaintiff does not challenge that conclusion on appeal.

In October, 1989, the town approved the Capitol Region Fair Housing Compact on Affordable Housing (compact). Under that compact, which was signed[30] by representatives of twenty-nine cities and towns in the greater Hartford area, "[e]ach municipality commits to make its best effort to satisfy 25 [percent] of its local shortfall in affordable housing[31] over the next [five] years." A June, 1993 annual progress report on the compact indicated that, as of March, 1993, the town had met 55 percent, or 122 of its compact goal of 220 affordable housing units. In addition, the town zoning regulations contain a planned area development provision that encourages affordable housing by providing density bonuses for such development. The members of the defendant town council were also entitled to take into account their own personal knowledge of other affordable housing units in the town. See *West Hartford Interfaith Coalition, Inc.* v. *Town Council*, supra, 228 Conn. 518; *Frito-Lay, Inc.* v. *Planning & Zoning Commission*, 206 Conn. 554, 570, 538 A.2d 1039 (1988). Thus, they knew that the town recently had approved a different affordable housing development, pursuant to which ten additional units were to be constructed soon, in addition to the 122 units that had been constructed. The record indicated that they also had relied on their knowledge that there were other sites in town that were

---

[30] Although the compact was signed by representatives of twenty-nine municipalities, the record does not disclose how many of those municipalities ultimately approved the compact by ratifying their representatives' signatures. Glastonbury, however, did so.

[31] In the compact, "affordable housing" is defined "as units for which households pay not more than thirty percent of their gross annual income, where such income is less than or equal to 100 [percent] of the regional median income." It is not precisely clear how this definition fits with the statutory definition of "affordable housing" in § 8-30g (a) (1). Both the plaintiff and the defendant, however, have assumed in their briefs that the two definitions are essentially the same. For purposes of this issue, therefore, we assume without deciding that the two definitions share the same essential characteristics.

suitable for affordable housing, in that there were such sites that were served by gas, water and sewer. Moreover, the plaintiff makes no claim that there are no other sites in the town that are suitable for affordable housing development. Finally, the defendant weighed this evidence of alternative sites together with its interest in protecting the substantial public interest in the preservation of open space, conservation and recreation on the specific parcel in question. On this record, we conclude that the defendant had a reasonable basis upon which to conclude that the public interest in the protection of open space, conservation and recreation clearly outweighed the need for affordable housing in the town. It cannot be denied that granting the plaintiff's application would have excised that particular parcel from the remaining acres of Metropolitan's land, and effectively would have eliminated its use for open space, conservation and recreation.

It is true that, as the plaintiff points out, as of 1993, only approximately 6 percent of the town's housing units were affordable housing—an amount that is less than the 10 percent that would, pursuant to § 8-30g (f), exempt the town from the special appeals provisions of § 8-30g (c). In light of the record evidence, however, this fact does not compel the conclusion that the defendant acted unreasonably in weighing the protection of open space, conservation and recreational uses of the particular parcel in question, against the need for affordable housing in the town.

Much the same reasoning applies to the defendant's burden under subparagraph (D) of § 8-30g (c) (1). As we have explained, where the public interest sought to be protected and the harm to that interest by granting the application is site specific, in that no changes to the proposed affordable housing development reasonably can be effected to protect that interest on that specific site, the zoning commission has satisfied its burden

under subparagraph (D). In the present case, it was reasonable for the defendant to conclude that, by granting the application, the defendant effectively would eliminate the parcel in question from use for open space, conservation and recreation and that residential development of the parcel would be wholly inconsistent with such uses. The fact that the proposed development contained some open space does not change those facts. There was sufficient evidence in the record for the defendant to have concluded that a 33.42 acre, twenty-eight unit residential subdivision, bisected by thirteen acres of open space, simply is not the same thing as 33.42 acres of open space.

The judgment is affirmed.

In this opinion CALLAHAN, C. J., and NORCOTT, KATZ, PALMER and MCDONALD, Js., concurred.

MCDONALD, J., concurring. I join the majority opinion. I write separately only to add that, with respect to part II C, I believe that the trial court properly focused on the effect of development upon the watershed and its conservation. As pointed out in footnote 27 of the majority opinion, any development of the site was recognized long ago as a threat to the watershed lands. Of necessity, such development would be a threat to the watershed. One purpose of open space, as the majority recognizes, is to conserve natural resources. Water is a prime element of those resources. I also conclude that no change to the development plans, so long as the plans called for any development, could conserve that natural resource.

BERDON, J., dissenting. Today the majority rips the soul out of affordable housing in the state of Connecticut. By enacting the affordable housing land use appeals statute, General Statutes § 8-30g (affordable housing), the legislature sought to address a panoply of social

ills.[1] First and foremost, the statute attempts to address the dire housing needs of low and moderate income citizens. See, e.g., *West Hartford Interfaith Coalition, Inc.* v. *Town Council*, 228 Conn. 498, 636 A.2d 1342 (1994). That said, affordable housing is not just about providing shelter for the economically disadvantaged. It is also about cultivating racial and ethnic diversity in residential communities, just as *Sheff* v. *O'Neill*, 238 Conn. 1, 678 A.2d 1267 (1996), was about cultivating racial and ethnic diversity in our classrooms.[2] My colleagues in the majority seem to have set their sights on frustrating these equitable aspirations.

This case calls upon us to resolve the issue that lies at the heart of affordable housing in this state: what burden is a municipality required to satisfy before it may reject an affordable housing proposal? According to the majority, this burden is exceedingly deferential to the local zoning authorities whom § 8-30g was designed to keep in check. In my view, both the plain meaning of § 8-30g and the history surrounding its enactment supply irrefutable evidence that the legislature intended to impose upon towns a rigorous burden that resembles the gauntlet of strict scrutiny. If there were any doubt about this conclusion, "the mandate of liberal construction would be sufficient to dispel it." *In re Baby Z.*, 247 Conn. 474, 551, 724 A.2d 1035 (1999) (*Berdon, J.,* dissenting); see *Kaufman* v. *Zoning Commission*, 232 Conn. 122, 140, 653 A.2d 798 (1995) ("[a]s

---

[1] Pursuant to General Statutes § 8-39a, " 'affordable housing' means housing for which persons and families pay thirty per cent or less of their annual income, where such income is less than or equal to the area median income for the municipality in which such housing is located, as determined by the United States Department of Housing and Urban Development." See footnote 2 of the majority opinion for the full text of § 8-30g. As indicated in the majority opinion, there have been changes made to § 8-30g since 1994, the time of the present appeal. Because those changes are not relevant to the present case, references herein are to the current revision.

[2] See footnote 4 of this dissent for an illustrative list of other social ills caused by the scarcity of affordable housing.

a remedial statute, § 8-30g must be liberally construed in favor of those whom the legislature intended to benefit" [internal quotation marks omitted]).[3]

One preliminary matter must be noted. A town can easily avoid the mandate of § 8-30g entirely—and thus revert to a traditional regime in which we must defer to its judgments—once it has attained the following goal: 10 percent of its dwelling units are affordable for families with low or moderate incomes. See General Statutes § 8-30g (f). Because the town of Glastonbury falls far short of qualifying for this exemption (only 6 percent of its housing is affordable), the present appeal does not implicate this escape clause.

I

In order to determine the burden that § 8-30g imposes upon a town before it may reject an affordable housing proposal, our fundamental objective is to evaluate the intent of the legislature. See, e.g., *West Hartford Interfaith Coalition, Inc.* v. *Town Council*, supra, 228 Conn. 507–508. "In seeking to discern [this legislative] intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *Conway* v. *Wilton*, 238 Conn. 653, 663, 680 A.2d 242 (1996); accord *Kaufman* v. *Zoning Commission*, supra, 232 Conn. 133; *State* v. *Rado*, 14 Conn. App. 322, 329, 541 A.2d 124, cert. denied, 208 Conn. 813, 546 A.2d 282,

---

[3] In an attempt to camouflage the fact that they have dismantled affordable housing, my colleagues in the majority emphasize insignificant differences between affordable housing land use appeals and traditional zoning appeals. This is the judicial equivalent of smoke and mirrors: if the legislature had not intended to establish a uniquely rigorous standard of appellate review to govern affordable housing appeals, it would have had no reason to enact § 8-30g.

cert. denied, 488 U.S. 927, 109 S. Ct. 311, 102 L. Ed. 2d 330 (1988) ("[i]t is axiomatic that courts are required to read a statute in light of its purpose"). I shall begin with a brief review of the legislative history surrounding the enactment of § 8-30g.

In 1987, the legislature established the Blue Ribbon Commission on Housing (Blue Ribbon Commission). Public Acts 1987, No. 87-550, § 4 (a). After conducting an intensive, two year study, the Blue Ribbon Commission released its "Report and Recommendations to the Governor and General Assembly, February 1, 1989" (Blue Ribbon Report). This report confirmed the worst fears about the magnitude of the housing crisis in our state.[4] Blue Ribbon Report, supra, pp. 7–10. The report also contained a comprehensive plan designed to address the crisis. Id., p. 1. The legislature modeled the original affordable housing appeals act on this comprehensive plan.

Although the legislature had attempted to encourage affordable housing before it enacted § 8-30g, the Blue Ribbon Commission concluded that local zoning authorities under the prior regime were not sufficiently sensitive to the dire need for affordable housing—at least not in their backyards. Blue Ribbon Report, supra, p. A-9. Accordingly, the Blue Ribbon Commission proposed a unique appeals process. In its most significant innovations, the Blue Ribbon Commission (1) proposed

---

[4] In some towns, the scarcity of affordable housing means that educators, firefighters and other public servants are unable to afford to live in the communities that they serve. See 32 H.R. Proc., Pt. 30, 1989 Sess., p. 10,664, remarks of Representative Oskar G. Rogg. Similarly, the shortage of affordable housing deprives many citizens of the opportunity to remain in their home towns, where they had hoped to live out their entire lives. The affordable housing crisis also threatens the state's economic prosperity, because Connecticut corporations have a difficult time recruiting employees. Blue Ribbon Report, supra, p. 15. Finally, the lack of affordable housing contributes to de facto segregation along the vectors of both race and ethnicity. Id., p. 6.

an appellate procedure that was much more efficient than garden-variety zoning appeals and (2) recommended displacing the traditional deferential standard of review with a rigorous burden of proof that would preclude a town from rejecting an affordable housing proposal unless it could marshal exceedingly persuasive reasons. Id., pp. A-6 through A-9. The legislature put the force of our law behind these recommendations.[5] By so doing, the legislature recognized the desperate need for affordable housing and demonstrated its robust commitment to addressing this need. See, e.g., *West Hartford Interfaith Coalition, Inc.* v. *Town Council,* supra, 228 Conn. 511 ("the key purpose of § 8-30g is to encourage and facilitate the much needed development of affordable housing throughout the state"). In contrast to garden-variety appeals from ordinary zoning decisions—in which the standard of review is highly deferential[6]—the legislature clearly intended to forbid a town from rejecting a proposal for affordable housing unless it could prove that its decision satisfied the rigorous criteria set forth in § 8-30g (c).[7]

The legislature did not create this new burden by accident. The forceful opposition from certain members of the legislature rules out the possibility that any legislator failed to appreciate the profound consequences

[5] More specifically, the legislature (1) created an expedited appeals process and (2) established several criteria that zoning authorities must consider when evaluating affordable housing applications. General Statutes § 8-30g (b). As discussed previously, this process does not apply to towns that have devoted at least 10 percent of their housing units to affordable housing. See General Statutes § 8-30g (f).

[6] Traditionally, a decision by a zoning authority "must be upheld by the trial court if [it is] reasonably supported by the record" and if the zoning authority has not acted arbitrarily, illegally or in abuse of its discretion. *Protect Hamden/North Haven from Excessive Traffic & Pollution, Inc.* v. *Planning & Zoning Commission,* 220 Conn. 527, 542–43, 600 A.2d 757 (1991).

[7] See part II of this dissent.

that would follow in the wake of the new law. Representative Robert M. Ward stated: "I don't see this just as a shifting of the burden. I see it really as throwing out the basic concept of zoning altogether." 32 H.R. Proc., Pt. 30, 1989 Sess., p. 10,651. Representative Oskar G. Rogg remarked that, under traditional zoning law, "as long as you acted reasonably . . . you won because . . . the applicant had to prove you were unreasonable . . . . Here we are reversing this whole process." Id., pp. 10,666–67. Senator Fred H. Lovegrove commented that, "[a]s I read this it seems to me that when a claim is filed against a municipality that they are considered guilty until they prove their innocence. I wondered why the bill wasn't written so that the burden of proof of abuse was on the developer, instead of the town having to prove they didn't abuse [their power]." 32 S. Proc., Pt. 12, 1989 Sess., p. 4052.

The Blue Ribbon Report—which we may presume received the careful consideration of every legislator—stated that the Blue Ribbon Commission was "sensitive to the strongly expressed concern of municipalities that they might lose control over the pace and direction of land development in their communities. Nonetheless, and despite lengthy discussions, the [Blue Ribbon Commission] was unable to develop any other proposal [aside from the special appeals procedure] that would ensure sufficient consideration is given to the affordable housing needs of those not already adequately housed in the municipality. [The Blue Ribbon Commission] strongly felt . . . that if municipalities do not give greater weight to the need for creation of affordable housing when evaluating development proposals, we will have business as usual: the housing crisis will not go away." Blue Ribbon Report, supra, p. A-9; see also *Town Close Associates* v. *Planning & Zoning Commission*, 42 Conn. App. 94, 104, 679 A.2d 378, cert. denied, 239 Conn. 914, 682 A.2d 1014 (1996).

A proponent of the bill, Representative Miles S. Rapoport underscored this sentiment, remarking that "[t]he primary conclusion of the Blue Ribbon Commission was that . . . the single largest obstacle to the building and creation of affordable housing . . . was the availability of affordable land and overcoming the resistance of communities who do not want to have affordable housing in those towns. . . . [I]f we're going to reject this amendment . . . we might as well say to ourselves . . . that [a community's right to decide] what kind of housing [it will have] far overshadows in our view the . . . amply demonstrated crisis—and I do believe it's a crisis—that we have in this state for affordable housing . . . ." 32 H.R. Proc., supra, pp. 10,672–75.

This legislative history thus establishes with unmistakable clarity the fact that the legislature intended § 8-30g to create a major shift away from traditional zoning law. See, e.g., *Town Close Associates* v. *Planning & Zoning Commission*, supra, 42 Conn. App. 104. As the Appellate Court observed several years ago, "[t]raditional land use policies did not solve Connecticut's affordable housing problem, and the legislature passed § 8-30g to effect a change." *Wisniowski* v. *Planning Commission*, 37 Conn. App. 303, 317, 655 A.2d 1146, cert. denied, 233 Conn. 909, 658 A.2d 981 (1995). It is against this backdrop that we must interpret the requirements imposed by § 8-30g.

## II

Pursuant to § 8-30g (c) (1), a town may not reject an affordable housing proposal unless, on appeal, it can sustain the burden of proving each of the following four elements: "(A) the decision from which such appeal is taken and the reasons cited for such decision are supported by *sufficient evidence* in the record; (B) the decision is *necessary* to protect *substantial public interests* in health, safety, or other matters which the

commission may legally consider; (C) such public interests *clearly outweigh* the need for affordable housing; and (D) such public interests *cannot be protected* by reasonable changes to the affordable housing development . . . ." (Emphasis added.) As the emphasized language makes clear, this standard establishes a new burden that is far more rigorous than the deferential review afforded to garden-variety zoning appeals.[8] From nothing more than the text of § 8-30g, it is thus apparent that affordable housing appeals are worlds apart from garden-variety zoning appeals.[9] See, e.g., *Kaufman* v. *Zoning Commission*, supra, 232 Conn. 150. I consider each subsection seriatim.

A

I begin with the plain language of § 8-30g (c) (1) (A): "the decision from which [an] appeal is taken and the reasons cited for such decision [must be] supported by sufficient evidence in the record . . . ."

We presume that the drafters of statutes are familiar with the legal definitions of the statutory terms that they decide to utilize. Black's Law Dictionary (6th Ed. 1990) defines "sufficient evidence" as "[a]dequate evidence; such evidence, in character, weight, or amount, as will legally justify the judicial or official action . . . evidence . . . which is satisfactory for the purpose; that amount of proof which ordinarily satisfies an unprejudiced mind, beyond a reasonable doubt. . . ."

---

[8] According to § 8-30g (c), "the *burden* shall be on the [zoning authority] to *prove*" the various matters set forth in subdivision (1) (A) through (D). (Emphasis added.) I am unable to comprehend the majority's claim that the emphasized words represent "linguistic inaccuracy." These are common, everyday words in the lexicon of every legislator, and the majority has supplied no reason to believe that even one legislator misunderstood their common, everyday meanings. Although I can understand why the majority is not pleased with this statutory language, this displeasure does not confer upon my colleagues the power to excise a sentence from the General Statutes.

[9] See footnote 6 of this dissent.

Instead of deferring to the majoritarian biases of zoning commissions, judges with "unprejudiced minds" must independently conclude that sufficient evidence exists. In the course of this inquiry, courts must reject evidence as insufficient unless it supplies "[legal] justif[ication] . . . beyond a reasonable doubt."[10] Id.

As the amicus cogently points out, the sufficient evidence standard "requires some objective verification or support beyond the mere belief of a commission. This reflects a fundamental concern of the Blue Ribbon Commission . . . that [i]t appears that many times the local commissions decisions elevate vaguely-stated and relatively unimportant concerns over the important need to build affordable housing."[11] (Internal quotation marks omitted.)

By employing the standard of "sufficient evidence," the legislature thus clearly and unambiguously directed courts to carefully scrutinize a zoning authority's decision to deny an application for affordable housing. It is well settled that, "[w]here the language of the statute is clear and unambiguous, we have refused to speculate as to the legislative intention, because it is assumed that the words express the intention of the legislature. *Hayes* v. *Smith*, 194 Conn. 52, 58, 480 A.2d 425 (1984); *Delevieleuse* v. *Manson*, 184 Conn. 434, 438–39, 439 A.2d

---

[10] To the extent that this court appeared to endorse a less rigorous standard in either *West Hartford Interfaith Coalition, Inc.*, or *Kaufman*, we should disavow such an ill-advised interpretation of the statutory language and the legislative history. Although I joined the majority opinions in *West Hartford Interfaith Coalition, Inc.*, and *Kaufman*, I never intended to endorse the interpretation of § 8-30g contained in the majority opinion in the present case. To the extent that I did so inadvertently, I acknowledge that it was an error. I wish that my colleagues in the majority shared my willingness to admit past mistakes in the interest of serving justice, instead of grappling themselves with hoops of steel to a jurisprudence that undermines the remedial purposes of affordable housing.

[11] One of the authors of the amicus brief was the cochair of the Land Use Subcommittee of the Blue Ribbon Commission.

1055 (1981); *Mazur* v. *Blum*, 184 Conn. 116, 118–19, 441 A.2d 65 (1981)." *Sutton* v. *Lopes*, 201 Conn. 115, 118–19, 513 A.2d 139, .cert. denied, 479 U.S. 964, 107 S. Ct. 466, 93 L. Ed. 2d 410 (1986); accord *Mattatuck Museum-Mattatuck Historical Society* v. *Administrator, Unemployment Compensation Act*, 238 Conn. 273, 279, 679 A.2d 347 (1996) ("[w]hen the language is plain and unambiguous, we need look no further than the words themselves because we assume that the language expresses the legislature's intent" [internal quotation marks omitted]); *State* v. *Luzietti*, 230 Conn. 427, 433, 646 A.2d 85 (1994) ("[i]t is axiomatic that, where the statutory language is clear and unambiguous, construction of the statute by reference to its history and purpose is unnecessary"); *Nichols* v. *Warren*, 209 Conn. 191, 196, 550 A.2d 309 (1988) ("When the statutory language is clear and unambiguous, it is from that source that we deduce the intent of the legislature. *Commissioner* v. *Freedom of Information Commission*, 204 Conn. 609, 620, 529 A.2d 692 (1987); *Rhodes* v. *Hartford*, 201 Conn. 89, 93, 513 A.2d 124 (1986); *Johnson* v. *Manson*, 196 Conn. 309, 316, 493 A.2d 846 (1985), cert. denied, 474 U.S. 1063, 106 S. Ct. 813, 88 L. Ed. 2d 787, reh. denied, 475 U.S. 1061, 106 S. Ct. 1290, 89 L. Ed. 2d 597 (1986); 2A J. Sutherland, [Statutory Construction (4th Ed. Sands 1984)] § 48.01.").

Nevertheless, in response to the majority's reliance upon legislative history, I wish to point out that my interpretation of § 8-30g (c) (1) (A) comports with the legislative intention to combat the majoritarian biases of local zoning authorities. Moreover, my interpretation of sufficient evidence is further reinforced by additional legislative history. The Blue Ribbon Commission recommended that the denial of an affordable housing application must be reversed unless the zoning authority proffers reasons that are (1) "bona fide," (2) "legitimate" and (3) "directly and substantially [necessary

to] protect public health and safety concerns that are significantly more important than the need for affordable housing . . . ." Blue Ribbon Report, supra, p. A-7. During the debate on the floor of the House, Representative Richard D. Tulisano, a proponent of the bill, was asked to clarify the sufficient evidence standard. Representative Dale W. Radcliffe asked Representative Tulisano to "give me an idea what sufficient evidence is. Is that a particular test? Has that been developed? Is there any precedent as to what sufficient evidence is?" 32 H.R. Proc., supra, p. 10,578. After Representative Radcliffe explained that he was familiar with the "fair preponderance," "clear and convincing" and "beyond a reasonable doubt" standards; id.; Representative Tulisano responded that the sufficient evidence standard "is none of the three . . . ." Id., p. 10,579. Instead, Representative Tulisano stated that sufficient evidence "is in fact a new system we're developing here today. . . . [C]ourt decisions have in fact left it to . . . the Boards of Planning and Zoning Commissions to reach these conclusions and particularly with evidence of—I'm trying to think of the word, belief, rather than any hard evidence and I think that *they will have to have something on the record that third parties can look at in an objective manner and reach the same conclusion.*"[12] (Emphasis added.) Id.

If the legislature had intended to insulate denials of affordable housing proposals with the deferential standard of review that we employ in garden-variety zoning appeals, it knew very well how to do so. Instead

---

[12] The majority correctly observes that Representative Tulisano also remarked that sufficient evidence "is not a very high standard whatsoever . . . ." (Internal quotation marks omitted.) In my view, it would be a grave error to rip this comment from its context and regard it—in isolation—as definitive. Instead, this remark must be viewed in the context of the other statements that Representative Tulisano and other legislators made on the floor of the House of Representatives. It also must be read alongside the Blue Ribbon Report, which it flatly contradicts.

of incorporating the traditional "abuse of discretion" standard, the legislature invoked the more rigorous criterion of sufficient evidence. *Steelcase, Inc.* v. *Crystal*, 238 Conn. 571, 586, 680 A.2d 289 (1996) (legislature deemed to be aware of settled meanings of terms in related areas of law when it enacts statute).

In short, the plain language of § 8-30g (c) (1) (A) and its legislative history supply ironclad evidence of the legislative intention to create a standard of review that requires zoning authorities to satisfy a high burden of persuasion before they may deny affordable housing proposals. In garden-variety zoning appeals, decisions by a zoning authority "must be upheld by the trial court if they are reasonably supported by the record" and if the zoning authority has not acted arbitrarily, illegally or in abuse of its discretion. *Protect Hamden/North Haven from Excessive Traffic & Pollution, Inc.* v. *Planning & Zoning Commission*, 220 Conn. 527, 542–43, 600 A.2d 757 (1991). When affordable housing is at stake, however, the record must contain "sufficient evidence," i.e., a sufficient quantum of evidence to persuade the unprejudiced minds of the trial court and the appellate courts that—from an objective standpoint—the reasons that the zoning authority has set forth rise to the level of legal justification beyond a reasonable doubt. See Black's Law Dictionary (6th Ed. 1990).

B

Section 8-30g (c) (1) (B) requires a zoning authority to prove—based upon "sufficient evidence" in the record—that its reasons for denying an affordable housing application are "necessary to protect substantial public interests in health, safety, or other matters which the commission may legally consider . . . ." We therefore must reverse the denial of an affordable housing proposal if the zoning authority has failed to sustain its

burden of proving by sufficient evidence two independent facts: (1) the public interest allegedly at stake is "substantial" and (2) there is a "necessary" nexus between the denial of the proposal and this substantial public interest. The plain meaning of the word "substantial" compels the conclusion that a proposal cannot be denied unless it represents a strong likelihood of significant harm to "health, safety, or other matters which the commission may legally consider . . . ."[13] General Statutes § 8-30g (c) (1) (B). Accordingly, the zoning authority must prove by sufficient evidence two independent facts: (1) the affordable housing proposal threatens a serious probability of grave harm to an interest that the commission may legally consider; and (2) denial is necessary to avert this harm.

C

Section 8-30g (c) (1) (C) builds upon subparagraphs (A) and (B). Once a zoning authority has established that it could not avert a serious probability of grave harm to substantial public interests without denying an affordable housing proposal, the zoning authority must go on to prove that these "public interests clearly outweigh the need for affordable housing . . . ."[14] General Statutes § 8-30g (c) (1) (C).

In determining precisely what is required under § 8-30g (c) (1) (C), we should begin with the pivotal piece

[13] It is apparent that a proffered justification cannot reasonably be deemed "substantial" if it presents no reasonable probability of any harm; a serious probability of minor harm; or a small probability of grave harm. See, e.g., *Kaufman* v. *Zoning Commission*, supra, 232 Conn. 156 (explaining that § 8-30g prohibits zoning authority from rejecting affordable housing application based upon "mere possibility" of harm).

[14] As the majority acknowledges, the named defendant in the present case, the town council of the town of Glastonbury (defendant), "fail[ed] to include the word 'clearly' " in its articulation of its reasons for denying the plaintiff's affordable housing proposal. Instead, the defendant simply asserted that various "considerations outweigh[ed] the need for affordable housing . . . ." Accordingly, the defendant did not even ask the right question, let alone provide a satisfactory answer to it.

of statutory language. According to Black's Law Dictionary (6th Ed. 1990), the term of art "clearly" is synonymous with the word "[u]nequivocal." Accordingly, subparagraph (C) requires that the public interests referred to in subparagraph (B) must unequivocally outweigh the need for affordable housing. It is apparent that this standard demands an exceedingly rigorous level of proof.

Before today, we had not yet decided the scope of the inquiry into the need for affordable housing. In other words, we had not previously determined whether we should evaluate the need for affordable housing by focusing at the statewide level, the regional level, or the local level. Today, the majority holds that "the need for affordable housing is to be addressed on a local basis." I believe that this holding is dangerously incorrect, and that it undermines the beneficial purposes of § 8-30g.

In *West Hartford Interfaith Coalition, Inc.* v. *Town Council,* supra, 228 Conn. 511, we noted that a local focus—as opposed to a statewide or regional focus—would threaten the development of affordable housing in wealthier towns. Because they have few low income residents, such towns could claim that they have no (local) need for affordable housing. For this reason, the need for affordable housing cannot be evaluated strictly in terms of a town's current population. As I discussed previously, § 8-30g was designed to address the following problems: (1) public servants are unable to afford to live in the communities that they serve; (2) Connecticut corporations have a difficult time recruiting employees; and (3) the lack of affordable housing contributes to de facto segregation along the vectors of both race and ethnicity. See footnote 4 of this dissent. Thus, an intelligent assessment of the need for affordable housing must take into account the needs of nonresidents who might decide to live in a town if affordable housing

were available.[15] The contrary result would permit afflu-
ent towns such as West Hartford, Glastonbury and
Greenwich to keep the poor corralled in ghettos in
Hartford, New Haven and Waterbury.

## D

Provided that sufficient evidence demonstrates (1)
that denial of an affordable housing application was
necessary to avert a serious probability of grave harm to
substantial public interests and (2) that these interests
unequivocally outweigh the need for affordable hous-
ing, the zoning authority must clear one final hurdle: it
must demonstrate that "such public interests cannot
be protected by reasonable changes to the affordable
housing development . . . ." General Statutes § 8-30g
(c) (1) (D). The majority has tacitly modeled its interpre-
tation of this final prong of § 8-30g on the analytic frame-
work set forth in *Huntington Branch, National
Association for the Advancement of Colored People* v.
*Huntington,* 844 F.2d 926 (2d Cir.), aff'd, 488 U.S. 15,
109 S. Ct. 276, 102 L. Ed. 2d 180 (1988). I join my
colleagues in adopting this well reasoned authority from
the Second Circuit Court of Appeals, upon which the
Blue Ribbon Commission placed heavy reliance.

In *Huntington,* the court distinguished between
"plan-specific" and "site-specific" reasons for denying
an affordable housing application. Id., 939. Plan-specific
problems may be eliminated by "requiring reasonable
design modifications." Id. Site-specific problems, in
contrast, can only be avoided by denying the applica-
tion. Id. Applying this approach to § 8-30g, the zoning
authority must approve an application for affordable
housing unless it can advance site-specific reasons for

---

[15] Nevertheless, I wish to reiterate that a town may opt out of the require-
ments of § 8-30g by setting aside 10 percent of its housing and ensuring that
it is affordable. See General Statutes § 8-30g (f).

its refusal to do so. In other words, denying the application for affordable housing must be the only way to avert a serious probability of grave harm to substantial public interests that are so important they unequivocally outweigh the need for affordable housing.

### III

I now apply the four part test set forth in § 8-30g (c) (1) to the evidence in the record. In my view, the trial court abused its discretion by concluding that the defendant satisfied its heavy burden with nothing more than the highly speculative assertion that "the proposed development *could* endanger a *potential future* water supply source . . . ." (Emphasis added.)

The named defendant, the town council of the town of Glastonbury (defendant), relied upon the following evidence to justify its decision to deny the application for the development of affordable housing: (1) a report by the Environmental Planning Services prepared in 1991 contained two sentences referring to the fact that the 578 acre tract owned by the Metropolitan District Commission (Metropolitan)—which included the thirty-three acre parcel at issue in the present case (parcel)—was "underlain by coarse-grained stratified drift with a saturated thickness . . . typically capable of yielding high quantities of ground water to properly developed wells and may be considered potential public water supply aquifers"; (2) a similar resolution was submitted by the defendant's conservation committee; (3) expert witness Sarah Trombetta, a senior consulting hydrogeologist, testified that the plaintiff's expert had not definitively established that the subject property could not be used for a water supply; (4) Trombetta submitted a report to the defendant stating that the parcel *might* support a community-sized water supply system of a sort already in use in Glastonbury; and (5) other experts testified that the development of the

parcel would preclude its use at any future time as a water supply source.

At the hearing before the defendant, the plaintiff offered the testimony of an expert witness, Jeffrey Heidtman, who is the senior vice president and chief hydrogeologist of Fuss and O'Neill, an engineering consulting firm. Based upon extensive tests that he performed on or near the parcel, Heidtman testified: (1) that the affordable housing proposal would have only a negligible impact on ground and surface water in the area; and (2) that no portion of the parcel was capable of supporting a significant ground water supply source. The plaintiff also introduced the results of a study performed by the engineering firm of Geraghty and Miller in 1966, which revealed that no land within 2000 feet of the parcel was suitable for groundwater exploration. Furthermore, the plaintiff produced evidence demonstrating that the defendant had stopped using the parcel as a public water source in 1953, because of its limited potential for supplying water in the future. Finally, the plaintiff adduced evidence that, more than forty years ago, the state department of public health designated the parcel as nonwatershed land.

The trial court determined: (1) that there was "sufficient evidence in the record" to support the defendant's conclusion that "the proposed development could endanger a potential future water supply source"; (2) that the application had to be denied in order to avert a serious probability of grave harm to " 'a substantial public interest in health, safety or other matters' "; and (3) that "loss of a potential public water supply is both a site-specific issue and one which is implicated by [the proposed] development with or without 'reasonable changes.' " In my view, the evidence that the defendant relied upon falls far short of satisfying the sufficient evidence standard contained in § 8-30g (c) (1) (A). Moreover, this evidence does not demonstrate that

denial of the application was necessary to avert a serious probability of grave harm to substantial public interests pursuant to § 8-30g (c) (1) (B). Accordingly, I believe that the trial court abused its discretion by affirming the defendant's denial of the affordable housing proposal.

To begin with, the evidence that the defendant relied upon is highly speculative. As in *Kaufman*, the record suggests only a mere possibility that the purported "substantial public interest" rises to the statutory level of proof by sufficient evidence—i.e., "that amount of proof which ordinarily satisfies an unprejudiced mind, beyond a reasonable doubt." Black's Law Dictionary (6th Ed. 1990). Indeed, it even fails under the majority's watered-down definition of sufficient evidence.

Trombetta—the only witness whose testimony supported the defendant's decision—made two fatal concessions: (1) that there was insufficient evidence to determine whether the parcel could be used as a ground or surface water supply; and (2) that development of the parcel "would likely have a limited or minimal impact on a ground water supply in the area . . . ." In light of these concessions, the trial court could not reasonably have determined that the defendant's explanation that the parcel was the site of a potential public water source was "legally justif[ied] . . . beyond a reasonable doubt."

In addition, the evidence in the record does not demonstrate that denial of the application was necessary to avert a serious probability of grave harm to the town's water supply. The defendant did not adduce any evidence with respect to the likelihood that the proposed development would cause any harm whatsoever, let alone substantial harm. The defendant merely asserted that it denied the application because development of the parcel "*could* endanger a *potential future* water

supply source . . . ." (Emphasis added.) As a matter of law, this sort of unsubstantiated speculation cannot satisfy § 8-30g (c) (1) (B). Even if it were true that the proposed development *could* endanger a *potential* source of water in the *future*, this is a far cry from the requisite showing that denial of the application is *necessary*.

Because the defendant failed to satisfy the threshold test of marshaling sufficient evidence to prove that it had to deny the proposal in order to avert a serious probability of grave harm to substantial public interests, my inquiry under § 8-30g has come to an end. The defendant's decision to deny the application in order to avoid theoretical and highly speculative problems with the future water supply must be reversed.

## IV

The majority claims that "[a] zone change must be sustained if even one of the stated reasons is sufficient to support it."[16] (Internal quotation marks omitted.) If we were deciding an ordinary, garden-variety zoning appeal, I would agree. In the context of affordable housing applications, however, the majority is simply wrong.

The statutory language precludes the majority's argument. Section 8-30g (c) (1) requires a town to demonstrate that its "decision is necessary to protect substantial public interest*s*"—plural—that "clearly outweigh the need for affordable housing . . . ." (Emphasis added.) This language demands a totality of the circumstances balancing test, in which the aggregate

---

[16] The majority extracts this sentence from *West Hartford Interfaith Coalition, Inc.* v. *Town Council*, supra, 228 Conn. 513. What the majority neglects to mention is that this language (1) is quoted directly from a garden-variety zoning case (*Protect Hamden/North Haven from Excessive Traffic & Pollution, Inc.* v. *Planning & Zoning Commission*, supra, 220 Conn. 544) and (2) has absolutely nothing to do with either § 8-30g in general or the holding of *West Hartford Interfaith Coalition, Inc.*, in particular.

heft of multiple public interests must "clearly outweigh" the need for affordable housing. For example, we will assume for the sake of argument that a town determined that the sum of two reasons "clearly outweighed" the need for affordable housing. If the reviewing court determined that one of these reasons did not satisfy the statutory criteria, then it would be senseless for the trial court to go on to review the town's conclusion that the sum of the valid and the invalid reasons clearly outweighed the need for affordable housing. The zoning authority very well may have come to its conclusion based upon the totality of a laundry list of reasons.

Moreover, a reviewing court generally cannot determine whether reliance upon a single invalid reason has tainted the entire decision to deny an affordable housing proposal. Ordinarily, the members of a zoning authority premise their ruling on a number of reasons that they consider in the aggregate; they do not articulate the extent to which they rely on any particular reason.[17] If one of these reasons is invalid, then we must reverse, for the simple reason that every member of the zoning authority may have deemed the invalid reason both sufficient and dispositive. In other words, it is possible that—but for the invalid reason—the zoning authority would have approved the application for affordable housing. The presence of other valid reasons does not diminish this possibility.[18]

---

[17] In the present case, the members of the town council did not articulate the extent to which they relied on any of the various reasons that they advanced in support of their decision to deny the affordable housing proposal.

[18] Let us assume for the sake of argument that one alternative reason satisfied the requirements of § 8-30g. This determination would not enable us to resolve the purely factual question of whether the zoning authority deemed that reason sufficient—in and of itself, wholly apart from any invalid reasons—to deny an affordable housing application. Notwithstanding the presence of at least one valid reason, it is apparent that a town nevertheless may have denied an application for affordable housing based upon nothing more than a single invalid reason. Accordingly, we must reverse a denial of an affordable housing application if we determine that even one of the proffered reasons is invalid.

## V

In part III of this dissent, I concluded that the defendant's highly speculative assertion that "the proposed development *could* endanger a *potential future* water supply source" does not satisfy the requirements of § 8-30g. As discussed in part IV of this dissent, this conclusion compels us to reverse the defendant's decision to deny the affordable housing application. Although I believe that no further analysis is required, I will nevertheless briefly respond to the majority's contrary opinion by demonstrating that not one of the defendant's remaining reasons passes muster.

## A

Aside from speculative theorizing about potential future water sources, the defendant asserted that the proposed development would increase traffic-related dangers. More specifically, the defendant stated that "[t]he proposed development would create a new road exiting onto an already acknowledged dangerous curve on Hebron Avenue just west of its intersection with Keeney Street [intersection] in an area of high risk, serious traffic accidents and high traffic volume. The proposed development would increase . . . traffic hazards [and] would expose residents of the proposed development . . . to unreasonable risks." In order to support this statement, the defendant relied upon generalizations and anecdotal evidence, none of which empirically documented the effect that the development would have on the intersection.[19]

[19] More specifically, the defendant heard testimony indicating that drivers experienced lengthy delays at the intersection, which is an area marked by significant traffic and a large number of accidents. An attorney who had represented zoning authorities in the past testified that he could not recall an approval of a new subdivision near any area that resembled the intersection. Furthermore, individual council members who had driven through the intersection stated that the development would make a bad intersection even worse.

A traffic analysis conducted by the plaintiff's expert witness, Luchs Associates, a professional engineering group, demonstrated that the proposed development would not adversely affect the volume of traffic at the intersection. In fact, these engineers concluded that the development would have no more than a negligible impact on the intersection. Another of the plaintiff's experts, Frederick Hesketh, a licensed engineer from F. A. Hesketh and Associates, concurred with this conclusion. Hesketh testified that approximately 5070 automobiles passed through the intersection every day. According to Hesketh, the proposed development would generate only 160 additional trips per day.

In light of this record evidence, it is apparent that the defendant's concerns about traffic fail to satisfy § 8-30g (c) (1) (C). In my view, it is perfectly obvious that the addition of 160 trips per day to an intersection that already averages over 5000 trips per day—a scant 3.2 percent increase—does not unequivocally outweigh the critical need for affordable housing.

B

The defendant next cited evidence of the desirability of "provid[ing] open space in order to meet local and regional needs."[20] This reason is pitifully inadequate. In essence, the defendant concluded that its interest in providing open space trumped the need to provide affordable housing. It could not be more obvious to me that the desirability of ample open space—which implicates interests that are purely aesthetic and recreational—cannot possibly clearly outweigh (1) the basic

[20] More specifically, the 1994 Town Plan of Development suggested that the defendant consider purchasing part of Metropolitan's land for preservation as open space. In addition, there was evidence indicating that the defendant has for quite some time viewed all of Metropolitan's property as a valuable site for open space and recreation.

human need for shelter and (2) the fundamental importance of racial and ethnic diversity. Even if I were mistaken, however, the defendant has failed to demonstrate that denial of the plaintiff's proposal is necessary to supply adequate open space.

Even if we were to assume for the sake of argument that the defendant's desire for open space rises to the level of a "substantial interest" within the meaning of § 8-30g (c) (1) (B), it is apparent that denial of the plaintiff's application is not "necessary to protect" this interest. The defendant has made no showing that development of the thirty-three acre parcel is likely to harm the defendant's ability to obtain adequate open space elsewhere. In addition, the plaintiff offered evidence demonstrating that residential development of the parcel pursuant to the plaintiff's proposal would in fact comport with the town plan, which identifies the thirty-three acre parcel as "fringe suburban." This means that it may be developed at a density of one dwelling unit per acre, which is precisely what the plaintiff's proposal sought to do.

The evidence relied upon by the defendant does not cast any doubt upon the conclusion that the town can accomplish its goal of providing ample open space without acquiring any of Metropolitan's holdings, let alone the thirty-three acre parcel at issue in this case. At best, the evidence merely indicates that the defendant had in the past considered acquiring some of the land owned by Metropolitan for open space. There is no reason to believe that development of the parcel—a noncontiguous, thirty-three acre portion of the 578 acres held by Metropolitan—would have jeopardized the defendant's ability to acquire sufficient land (including some portion of the remaining 545 acres held by Metropolitan) for use as open space.

Emphasizing that the parcel is "particularly appropriate for open space," the majority states that "other

sites in town . . . were suitable for affordable housing . . . [and that] the plaintiff makes no claim that there are no other sites in the town that are suitable for affordable housing development." This analysis has nothing at all to do with the inquiry that is prescribed in § 8-30g. To begin with, the possibility that the parcel is "particularly appropriate" for use as open space has nothing to do with the importance of devoting the parcel to aesthetic and recreational enjoyment, as opposed to affordable housing. Accordingly, this factor is irrelevant.[21]

Moreover, there is nothing in the text of § 8-30g suggesting that the plaintiff must bear the burden of proving that the parcel is the only possible location in town where affordable housing could be situated. Instead, the legislature placed all of the relevant burdens on the shoulders of the zoning authority, which failed to demonstrate that there were no other sites in town that were suitable for use as open space.[22] It is perfectly

---

[21] While the majority is correct "that granting the plaintiff's application would have excised [the] parcel from the remaining acres of Metropolitan's land, and effectively would have eliminated its use for open space, conservation and recreation," I fail to see what this observation has to do with § 8-30g. Every affordable housing development entails certain opportunity costs. This is so for the simple reason that the same spot cannot be occupied simultaneously by both an affordable housing development and, for example, a drive-in movie theater. As this hypothetical demonstrates, however, the fact that an opportunity cost exists does not mean that the need for affordable housing is necessarily clearly outweighed.

In a similar vein, the majority asserts in the final sentence of its opinion that the zoning authority properly determined "that a 33.42 acre, twenty-eight unit residential subdivision, bisected by thirteen acres of open space, simply is not the same thing as 33.42 acres of open space." This is undeniably true, but it has nothing to do with the requirements imposed on the zoning authority by § 8-30g.

[22] In addition to finding no support in the text of § 8-30g, the regime posited by the majority makes no sense. It is exceedingly unlikely that any developer could ever prove that a given piece of land is the only place in town where affordable housing could be built. Under the majority's view, therefore, the zoning authority could always reject an affordable housing proposal by pointing to an available piece of property someplace else.

clear to me that it is this latter issue that lies at the heart of the proper determination of whether the desirability of open space clearly outweighs the need for affordable housing. Nevertheless, the majority refuses to consider it.

For these reasons, the defendant's decision to deny the plaintiff's proposal for affordable housing violates § 8-30g (c) (1) (B) and (C).

## C

Finally, the defendant claimed that, because Metropolitan holds the parcel in public trust, an affordable housing proposal should not be considered until a comprehensive plan has been completed that accounts for all of Metropolitan's holdings. The defendant has declined to pursue this argument on appeal, and for good reason: it is apparent that Metropolitan has the authority to sell the parcel to the defendant.

## VI

By equating affordable housing appeals with garden-variety zoning appeals, the majority today undermines the statutory promise of affordable housing. In the process, the majority disregards: (1) the plain meaning of the statutory language; (2) clear expressions of legislative intent; and (3) the mandate that we must liberally construe statutes like § 8-30g if such a construction is necessary to fulfill the legislature's broad remedial goals. It would appear that the vocal minority of legislators who feared that § 8-30g would "[throw] out the basic concept of zoning altogether"; 32 H.R. Proc., supra, p. 10,651, remarks of Representative Ward; had nothing to worry about. The majority of this court, sitting as a superlegislature, has overruled the work of the elected representatives of the people. The majority effectively has unraveled the tapestry of shelter provided by affordable housing.

In my view, we should remand this appeal to the defendant with direction to grant the plaintiff's application for affordable housing. Accordingly, I dissent.