[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff, Mutual Housing Association (MHA), appeals a decision by the defendant, the planning and zoning commission of the town of Trumbull (the commission), modifying and approving MHA's site plan application under Connecticut's Affordable Housing Act and Trumbull's zoning regulations. The commission acted pursuant to the zoning regulations of the town of Trumbull and chapter 124 of the General Statutes. MHA appeals pursuant to General Statutes § S-30g.
 I. PROCEDURAL HISTORY
CT Page 11584
The commission sent a letter dated May 27, 1998 to MHA, reporting its May 20, 1998 decision to deny MHA's site plan application. On June 15, 1998, the commission published notice of its decision in the Connecticut Post. (Return of Record [ROR], Item 7.)
MHA thereafter submitted a revised site plan for approval, as permitted by General Statutes § 8-30g (d). (ROR, Items 9, 9a.) The commission modified and approved the MHA site plan at its July 1, 1998 meeting. (ROR, Item 12.) The commission mailed a letter to MHA on July 6, 1998, communicating its decision. (ROR, Item 14.) The commission published notice of its decision on July 8, 1998. (ROR, Item 13.)
MHA served process on July 21, 1998 by leaving copies of its citation and appeal with the town clerk of Trumbull and the chairman of the commission. (Sheriff's Return.)
The commission filed an answer and return of record. Both MHA and the commission filed briefs.
 II. FACTS
MHA is "a regional nonprofit housing development corporation with extensive experience in the administration of and compliance with affordable housing programs and regulations." (ROR, Item 1.) Although it is not the record owner of the subject property, MHA has developed a plan to create affordable housing at 88 White Plains Road in Trumbull, Connecticut. (ROR, Item 1.)
In 1996, this court heard an appeal brought by MHA challenging the commission's decision to deny MHA's application for a zone change that would allow them to develop their proposed affordable housing. See Mutual Housing Assn. v. Planning ZoningCommission, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 549155 (August 12, 1996, Koletsky, J.). This court reversed the decision of the commission, ordering the commission to approve the application for a zone change. See id.
After the creation of a Housing Opportunity Development (HOD) Zone, MHA submitted an application for a special permit and approval of their site plan. (ROR, Item 1.) MHA proposed 52 housing units in eight buildings, plus a community building. (ROR, Items 1; 1c, Drawing No. SE2.) CT Page 11585
The commission held a public hearing on the application on March 18, 1998, following the publication of notice on March 7 and March 13. (ROR, Items 3; 4.) The commission denied the MHA application on May 20, 1998, stating the following reasons for its decision:
"1) The proposed turn-around is inadequate and unsafe. A UPS truck cannot even navigate turning around.
"2) Proposed location of Building I#8 poses a hazardous situation being in close proximity to the outlet plunge pool.
"3 There is a tremendous lack of square footage set aside for recreational purposes which may result in the unsafe condition of children playing in the street. There is no adequate area for adult recreational pursuits.
"[Chairman] Capasso added that it is totally inadequate as far as safety for anyone who would live in this complex." (Return of Record [ROR], Item 6; see also ROR, Item 8.)
Following the denial, MHA submitted a revised site plan to the commission, which "enlarged the turning area, increased slightly the size of the recreation areas and made the "plunge pool' area shallower." (ROR, Items 9; 9a.) The revised plan also increased the square footage of the fenced play area for children and eliminated two units from building number eight, bringing the total number of units to fifty. (ROR, Items 9; 9a; 11, p. 4.)
On June 20 and 26, 1998, the commission published notice of a public hearing to be held on July 1, 1998. (ROR, Item 10.) Following the hearing, also on July 1, the commission modified and approved the application, subject to a list of conditions. The conditions that are pertinent to this appeal are as follows:
"1) Building #8 shall be eliminated entirely, and the open recreation space shown on the plan shall be expanded to encompass the land that exists under building #8.
 * * *
"10) Building plans and specifications must have the approval of the Connecticut Department of Labor with respect to compliance with OSHA standards. (ROR, Item 12.) CT Page 11586
The commission stated that it "unanimously agreed to modify the site plan because Building #8 was placed directly in the center of the complex and would adversely conflict with the recreation area for the entire project, affecting the health, safety, and welfare of the residents. Because of the large number of units, the Commission determined the existing recreation space was inadequate and would reduce the health and quality of life of the residents, particularly the children." (ROR, Item 12.)
MHA now appeals the commission's July 1 decision.
 III. JURISDICTION A. Aggrievement
MHA alleges that it is aggrieved both under § 8-30g (b), which was enacted as a portion of the Affordable Housing Act, and under § 8-8, which allows "any person aggrieved by any decision of a board" to appeal to the superior court. Section 8-30g (b) provides that "any person whose affordable housing application is denied or is approved with restrictions which have a substantial adverse impact on the viability of the affordable housing development or the degree of affordability of the affordable dwelling units . . . contained in the affordable housing development, may appeal such decision pursuant to the procedures of this section."
To qualify for review under the Affordable Housing Act, however, MHA must establish that it qualifies as a person whose application has been "approved with restrictions which have a substantial adverse affect on the viability of the affordable housing development or the degree of affordability of the affordable dwelling units." Christian Activities CouncilCongregational v. Town Council of the Town of Glastonbury, et al,249 Conn. 566, 575-6 (1999). Based on the stipulation of facts presented at the hearing, and on the testimony adduced at that hearing, the court finds that MHA is "aggrieved" under §8-30g(b), since the degree of affordability of the affordable dwelling units will be impacted in a substantially adverse manner by the restriction removing Building Eight from the project.
 B. Timeliness and Service of Process
The commission provided published notice of its decision on CT Page 11587 July 8, 1998. (ROR, Item 13.) MHA commenced its appeal by service of process on July 21, 1998, within the fifteen-day period prescribed by General Statutes §§ 8-8 (b) and 8-30g (b). MHA served the town clerk and the chairman of the commission, as required by General Statutes §§ 8-8 (e) and 8-30g (b). The court finds that MHA's appeal was filed in accordance with the timing and service of process provisions of the General Statutes.
 IV. SCOPE AND STANDARD OF JUDICIAL REVIEW
"[W]hen a zoning commission reviews a site plan, it is engaged in a ministerial process. . . ." Connecticut HealthFacilities, Inc. v. Zoning Board of Appeals, 29 Conn. App. 1, 6,613 A.2d 1358 (1992). Similarly, "[w]hen ruling upon an application for a special permit, a planning and zoning board acts in an administrative capacity." Double I Limited Partnershipv. Plan Zoning Commission, 218 Conn. 65, 72, 588 A.2d 624
(1991). "[W]hen acting in an administrative capacity, a zoning commission's more limited function is to determine whether the applicant's proposed use is one which satisfies the standards set forth in the regulations and the statutes." (Internal quotation marks omitted.) West Hartford Interfaith Coalition, Inc. v. TownCouncil, 228 Conn. 498, 505-06, 636 A.2d 1342 (1994). ""If the plan submitted conforms to [the] regulations, the council has no discretion or choice but to approve it."' Westport v. Norwalk,167 Conn. 151, 155, 355 A.2d 25 (1974). However, "Connecticut courts have never held that a zoning commission lacks the ability to exercise discretion to determine whether the general standards in the regulations have been met in the special permit process." (Internal quotation marks omitted.) Irwin Planning ZoningCommission, 244 Conn. 619, 627, 711 A.2d 675 (1998).
Trumbull's zoning regulations require that "[a]ny Housing Opportunity Development (HOD) constructed within the town shall be in full compliance with all of the requirements of this [HOD zone] regulation as well as all other applicable town ordinances and regulations." (ROR, Item 16, Art. XVI, § 2.) Thus the commission is bound by article XV, § 4 of the regulations, which states: "In reviewing site plans the Commission shall take into consideration the purposes of these regulations, including the purposes of the applicable zoning district, the safety and convenience of the general public, and the maintenance of property values." (ROR, Item 16.)
MHA's application for a site plan, approval[1] is also subject CT Page 11588 to General Statutes § 8-30g (c), which provides, in pertinent part, that in appeals by applicants of affordable housing decisions, "the burden shall be on the commission to prove, based upon the evidence in the record compiled before such commission that (1)(A) the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record; (B) the decision is necessary to protect substantial public interests in health, safety, or other matters which the commission may legally consider; (C) such public interests clearly outweigh the need for affordable housing; (D) such public interests cannot be protected by reasonable changes to the affordable housing development. . . ." "The burden of proof established in § 8-30g is a specific, narrow standard that a commission must satisfy on appeal." Wisniowski v. PlanningCommission, 37 Conn. App. 303, 313, 655 A.2d 1146, cert. denied,233 Conn. 909, 658 A.2d 981 (1995). "Section 8-30 does not allow a commission to use its traditional zoning regulations to justify a denial of an affordable housing application, but rather forces the commission to satisfy the statutory burden of proof." Id., 317. The language of § 8-30g applies "to every type of application filed with a commission in connection with an affordable housing proposal." West Hartford Interfaith Coalition,Inc. v. Town Council, supra, 228 Conn. 509.
Under § 5-30g (c)(1)(A)'s "sufficient evidence" standard, the commission must show that "the record before the [commission] support[ed] the decision reached . . . and that the commission did not act arbitrarily . . . illegally . . . or in abuse of discretion." (Internal quotation marks omitted.) Kaufman v.Zoning Commission, 232 Conn. 122, 153, 653 A.2d 798 (1995). Thus, the court must first determine whether there was "sufficient evidence in the record to support the reason for [the commission's decision]." Mackowski v. Stratford Planning ZoningCommission, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 334661 (October 22, 1998, Belinkie, J.). If the court finds sufficient evidence to support the commission's decision, the court "must then scrutinize the reason itself," to determine whether the commission is protecting a substantial public interest that outweighs the need for affordable housing. Id.
 V. DISCUSSION
MHA argues that the commission's reasons for imposing a condition that would eliminate six units from the development do CT Page 11589 not satisfy General Statutes § 8-30g (c).
 A. Compliance with the HOD Recreation Area Regulations
MHA alleges that "[t]he location of Building No. 8 on the site plan, does not violate any provision of the HOD zone or any other zoning regulation of the Town of Trumbull." (Appeal, ¶ 24.) Further, MIHA alleges that "[t]he Commission's elimination of Building No. 8 . . . [is] not supported by sufficient evidence in the record; do[es] not constitute a substantial public interest in health, safety, or any other matter that the Commission may legally consider; do[es] not clearly outweigh the need for affordable housing in the Town of Trumbull; and could have been protected by reasonable changes to the development, and thus violate[s] § 8-30g (c) of the General Statutes." (Appeal, ¶ 6 29.)
MHA argues that the amount of land devoted to recreation in the MHA site plan complies with the HOD zoning regulations. The article in Trumbull's regulations that governs HOD zones includes a regulation on "Recreation Area and Open Space." (ROR, Item 16, Zoning Regulations, Art. XVI, § 13.) This regulation provides: "There shall be provided within the HOD a community/recreational facility to serve the residents of the HOD, located so as to insure the health, safety and convenience of the residents of the HOD. All of the areas within the HOD that are not improved as authorized by these regulations shall be suitably landscaped except for any portion of the property which is not disturbed as a result of improvements or construction activities which may be left in their natural, unimproved state." (ROR, Item 16, Zoning Regulations, Art. XVI, § 13.) The regulations also provide that "[a]reas which shall be ummproved or which shall contain approved landscaping or which shall be used for recreational areas, shall, in the aggregate, contain not less than forty percent (40%) of the total area." (ROR, Item 16, Zoning Regulations, Art. XVI, § 8 (B).) The regulations provide no minimum requirement as to the size of the required recreational area.
Based on the plans provided, it is clear that MHA has both provided the required recreation area and planned an adequate amount of unimproved, landscaped and recreation space. (See ROR, Item 9a, Drawing SE2.) The buildings cover 41.4 percent of the site, leaving 58.6 percent of the site unimproved, landscaped, or set aside for recreation. (See ROR, Item 9a, Drawing SE2) The court finds, therefore, that MHA has complied with the HOD zoning CT Page 11590 regulations. Hence, the court must now determine whether there is sufficient evidence in the record to support the commission's stated health and safety rationale.
 B. "Health, Safety and Welfare of the Residents"
MHA alleges that the commission's "elimination of Building No. 8 . . . do[es] not constitute a substantial public interest in health, safety, or any other matter that the Commission may legally consider. . . ." (Appeal, ¶ 29.) MHA argues that there is no substantial evidence on the record of any safety hazard. Further, MIHIA argues that the reasons the commission gave for its modification of the proposed development do not demonstrate a substantial public health and safety issue. MHA argues that the elimination of the six units fails the § 8-30g balancing test. Section 8-30g (c)(1)(C) provides that the commission must "prove," based on the record, that substantial public interests in health, safety, or other matters which the commission may legally consider "clearly outweigh the need for affordable housing."
In its decision, the commission unanimously agreed to eliminate building number eight from MHA's plan in order to increase the amount of recreation space. (ROR, Item 12.) The commission reasoned that the building "would adversely conflict with the recreation area for the entire project, affecting the health, safety, and welfare of the residents. Because of the large number of units, the Commission determined the existing recreation space was inadequate and would reduce the health and quality of life of the residents, particularly the children." (ROR, Item 12.) The commission argues in its brief that it "had numerous concerns relative to the safe development of the [MHA] complex which will be revealed by a thorough reading of the testimony of all parties at the two public hearings and underscored by the interaction of the commissioners in questioning the proponents and opponents as well as their expert witnesses."[2] (Commission's Brief, p. 15.) The commission further argues that because the abutting property owned by Vineyard Construction (Vineyard) is also an affordable housing development, Vineyard should also be afforded protection "from excessive congestion, crowded, unsafe conditions on the [MHA] site, and from becoming the playground or "open space' for all children resident on the [MHA] site." (Commission's Brief, p. 15.) CT Page 11591
"It is well settled that a planning and zoning commission pursuant to appropriate regulations may impose reasonable conditions not specifically articulated in the regulations which are necessary to protect the health, safety, convenience and property values adjoining the specific site of the project under review." Griswold Hills Newington v. Planning Zoning Commission
Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 540954 (January 9, 1996, Mottolese, J.), citing Shulman v. Zoning Board of Appeals, 154 Conn. 426,226 A.2d 380 (1967). Those conditions, of course, must be justified by sufficient evidence in the record.
At the July 1, 1998 public hearing, Bruce Bombero, a licensed professional engineer representing Vineyard, stated that "[t]here really isn't that much recreation area; there's only about a quarter acre of green around these buildings which isn't much area really for recreational purposes for a facility of this size. In the proximity of the community building, this ponded area is, I would consider, a hazardous situation. I would recommend that community building be relocated some place else on the site. I mean, put it over in the corner or something and you could have fields or something on the side of it. For recreation keep it away from the ponded area there. I know first hand it is a hazard. My brother who was a toddler at the time, fell into a tree well which was filled with water which was only about a foot, foot and a half. If my father wasn't there he would have drowned. So, it is a hazard if children are unattended. . . . Granted, it isn't ponded for very long but it doesn't take very long for a toddler to fall in the water." (ROR, Item 11, pp. 19-20.)
MHA's attorney thereafter asked Bombero about conditions on Vineyard Construction's abutting property, called Stonebridge Estates.
"ATTORNEY HOLLISTER: . . . Mr. Bombero, what is the depth and width of the ponds on the Stonebridge property?
"MR. BOMBERO: The depth of the pond is approximately six feet by Wetland approval.
"ATTORNEY HOLLISTER: Is there any fence?
"MR. BOMBERO: They didn't require a fence but there is a open unobstructed area all around that walkway that the Commission CT Page 11592 required.
"ATTORNEY HOLLISTER: Is it an unsafe situation on the Stonebridge property?
"MR. BOMBERO: I'm not saying it's an unsafe situation, it's just (inaudible) we don't have a community building. I'm saying, toddlers, it's an unsafe situation for toddlers. You have a community building that's close to a ponded area. It's two different situations. If you relocate that recreational facility away from that, you reduce the hazard."
(ROR, Item 11, p. 21.)
Martin Stauer, the architect for Stonebridge Estates, commented that "there will obviously be a substantial number of children. I would guess easily 100 children; it could be much higher. The designated outdoor playing area is still woefully inadequate. This play area has to be vastly expanded or else children will seek to play on adjoining private properties. It is also compounded by the fact there are no clear circulation sidewalks for children, and therefore they will play on the driveway areas making for a very dangerous situation. Architectural graphic standards states there should be 65 to 70 square feet of play area space per child, for healthy growth as recommended by the U.S. Government. Taken at the lower number, 65 square feet times 100 children equals 6, 500 square feet for play areal. . . . And this is a minimum, it should be larger." (ROR, Item 11, pp. 17-18.)
Holt McChord, the registered professional engineer who developed MHA's plans, commented on the safety of the plunge pool area in the MHA proposal when questioned by the commissioners at the July 1, 1998 hearing.
"MR. [ANTHONY] CHORY [commissioner]: . . . Can you clarify the safety concerns. You said basically you have put up a . . . you didn't put a fence there right?
"MR. MC CHORD: No there is a wall that naturally separates.
"MR. CHORY: A rock wall?
"MR. MC CHORD: A stone wall, yes. There is new planting that naturally separates. There are the existing group of six trees CT Page 11593 that are here that are separate, that are a form of separation from the building to that area and it's not in a direct walking line, you're not getting anywhere to walk there. [See ROR, Item 11 a.] So those elements, the planting, existing trees, and the wall itself, are all barriers to someone going to that location, and as you can see with the design of the outlet structure, there is nothing, no great hole to fall into, there's no great opening that is going to suck somebody in. . . .
"MR. CHORY: How high is the wall?
"MR. MC CHORD: . . . [I]t's less than 4 [feet]. [See ROR, Item 9a, Drawing DT1.]
 * * *
"MR. CHORY: Well the children would still be able to go from the dry area to the wet area. Is that right?
"MR. MC CHORD: Yes, they would. Truthfully (inaudible).
"MR. CHORY: Which has always been our concern.
"MR. MC CHORD: Yes, and right up the street at the crossing of Beardsley Parkway you have just the same condition under a road but actually a larger opening for a pipe for a child to go through.
"MR. [ANTHONY] CAPASSO [chairman of the commission]: But there's not any housing units there, where you're going to have a group of children of families that are congregated because they live there. Is that correct? You've got a pipe, pipes all over the place.
"MR. MC CHORD: That's right. That's my point actually.
"MR. CAPASSO: Yes, sure. But they don't live there.
"MR. MC CHORD: Yes. You have people that live here adjacent to that. You have people that live here adjacent to this. This is not an onerous thing.
 * * *
"MR. CAPASSO: So what it really comes down to is they can drown CT Page 11594 in your place as well as Beardsley Park.
"MR. MC CHORD: Actually, I think it would be a lot . . .
"MR. CAPASSO: Is what you are saying.
"MR. MC CHORD: Actually, I think it would be a lot harder to drown in my place than here or Beardsley Park.
"MR. CAPASSO: Well, I would expect you to say that but it's a fact that they could. Either place.
"MR. MC CHORD: You know what. I don't want to be argumentative. They could drown in a lot of places in this town.
"MR. CAPASSO: Okay.
"MR. MC CHORD: Is this really unsafe an unsafe condition? I professionally don't believe so."
(ROR, Item 11, pp. 6-8.)
Other courts have decided affordable housing appeals based on hearing evidence similar to that recorded above. In West HartfordInterfaith Coalition, Inc. v. Town Council, supra, 228 Conn. 498, the Supreme Court addressed concerns about the size and density of a proposed affordable housing development. The court affirmed the trial court's conclusion that "there was no evidence that [problems concerning the size and density of the proposed development] "clearly outweigh[ed] the need for affordable housing' as required by § 8-30g (c)(3) [now (Rev, to 1999) §8-30g (c)(1)(C)]." Id., 515-16. In reaching its decision, the trial court observed that neighboring properties were more intensely developed than the applicant's would be. Id., 516. Further, the trial court remarked that the applicant's plan covered even less area than the regulations required. Id., 517.
In Rinaldi v. Suffield Zoning Planning Commission, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 533603 (October 26, 1995, Leheny, J.), where "[t]he Commission expressed concern over the lack of usable open space considering it "essential to establish a reasonable quality of life for those residing with the proposed development," the court concluded that the commission had not met its burden of proving that the public interest in preserving the open space CT Page 11595 outweighed the need for affordable housing. Id. The court addressed the argument that children "would probably look to the detention ponds and wetlands as a place to play, which is undesirable and unsafe," concluding that "the Commission could have attached specific conditions for enclosing the detention ponds and wetlands to prevent children's access." Id.
In Old Farms Crossing Associates Ltd. Partnership v. Planning Zoning Commission, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 547862 (June 6, 1996, Mottolese, J.), "[t]he court note[d] that there [was] no expert testimony in the record that conclude[d] that children would be more likely than not to wander into or play [on roads] in the circumstances of [the] case." The commission heard from an engineer that child safety was an issue, but, the trial court's conclusion that "there was no expert testimony" on the issue indicates that the court probably did not consider the engineer an expert on child safety concerns. Id. The court added that, "[w]hile the members of the commission were entitled to rely on their own knowledge of the area to confirm facts to which witnesses have testified, they may not do so with regard to beliefs or opinions."
In another recent Superior Court case, Saranor Apartments v.Planning Zoning Board, Superior Court, judicial district of Ansonia-Milford at Milford, Docket No. 52740 (November 24, 1997, Ripley, J.), the court stated: "this court cannot conclude that the record supports the commission's conclusion that the difference between 84 units and the applicant's proposed 104 units is of sufficient import so that the denial of the application [as to the additional units] was necessary to protect substantial public interests and that such difference clearly outweighed the need for such housing in the community." The record revealed "the concern on the part of one member that . . . th[e] particular site was inappropriate, the proposal [was] an overuse and the buildings [were] too high." Id. However, the record included "no specific observations of any particular hazard being presented by the number of units being requested by the applicant." Id. The court "approve[d] the application as modified by the Board with the exception of the number of units which shall be 104 instead of 84." Id.
Here, it is clear that the plunge pool about which the commission complains is less deep and better protected from wandering children than the pond on the abutting Vineyard CT Page 11596 property. (See ROR, Item 11, pp. 6-8, 11.) Furthermore, the commission had the option of imposing a reasonable modification to the application to protect children from the alleged water hazard by requiring installation of barriers to access, not by eliminating an entire building from the development.
The commission's modification of the site plan eliminating housing units to increase the amount of open space is only tangentially related to engineer Bombero's suggestion that the community building's proximity to the plunge pool constitutes a safety hazard. (See ROR, Item 11, pp. 19-20.)
Aside from the risks associated with the plunge pool, the record reveals no evidence of a health or safety risk resulting from the amount of recreation space provided in the site plan. It is found, therefore, that the commission has not met its § 8-30g
burden of demonstrating sufficient evidence in the record that the public interest in eliminating Building Eight to increase the amount of open space outweighs the need for affordable housing under § 8-30g (c)(1)(C). Nor has the commission proved that the safety interest "cannot be protected by reasonable changes to the affordable housing development." § 8-30g (c)(1)(D).
 B. Requirement of Approval by the Department of Labor
Finally, MHA argues that by imposing the tenth modification, the condition requiring approval from the Department of Labor, the commission exceeded its authority. "[A]ny conditions imposed by the zoning authority must be reasonable." Vaszauskas v. ZoningBoard of Appeals, 215 Conn. 58, 64, 574 A.2d 212 (1990).
The court holds that the tenth condition bears no relationship to the safety concerns stated by the commission as reasons for its decision. The Occupational Safety and Health Act (OSHA) was created to deal with "personal injuries and illnesses arising out of work situations." 29 U.S.C. § 651 (a). It is undisputed that no occupational safety concerns were raised at the hearing on the application; nor did the commission raise any such issue thereafter. It is found, therefore, that the commission lacked sufficient evidence on the record to conclude that "building plans and specifications must have the approval of the Connecticut Department of Labor with respect to compliance with OSHA standards." At oral argument, counsel for the commission advised that this condition is a form requirement imposed on all site plan approvals. Nonetheless, the condition, CT Page 11597 form or not, must still pass muster if challenged.
"The imposition of . . . void conditions does not necessarily render the whole decision illegal and inefficacious. If there are sufficient grounds to support the remaining action of the commission, which is not contested by the parties, a modification of the decision may be decreed." Beckish v. Planning ZoningCommission, 162 Conn. 11, 18, 291 A.2d 208 (1971). "[W]here an exception or a special permit is granted and the grant is otherwise valid except that it is made reasonably conditional on the favorable action by another agency or agencies over which the zoning authority has no control, its issuance will not be held invalid solely because of the existence of any such condition." (Emphasis in original; internal quotation marks omitted.) Kaufmanv. Zoning Commission, 232 Conn. 122, 163-64 n. 24, 653 A.2d 798
(1995). Hence, there is no doubt that the court may void condition number ten without invalidating the commission's entire decision.
 VI. CONCLUSION
For the foregoing reasons, this court sustains MHA's appeal as to the first and tenth conditions imposed by the commission and remands the matter to the commission with direction to issue a decision approving the same site plan approved at its meeting of July 1, 1998, without conditions one and ten, and without any additional conditions beyond those already imposed on July 1, 1998.
Koletsky, J.